CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD CO. ET AL. *v.* ACME FAST FREIGHT, INC.

No. 65.  Argued December 8, 1948.—Decided April 4, 1949.

466

*Joseph Walker* and *Rowland L. Davis, Jr.* argued the cause for petitioners. With them on the brief were *William F. Zearfaus, Arthur C. Patterson, Thomas L. Ennis, Joseph Rosch* and *H. Brua Campbell.*

*Paul A. Crouch* argued the cause and filed a brief for respondent.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

In 1942, Congress enacted what is popularly known as the Freight Forwarder Act. This legislation, which appears as Part IV[1] of the Interstate Commerce Act, was designed to define freight forwarders, to prescribe certain regulations governing forwarder operations, and to bring this essential transportation business within the control of the Interstate Commerce Commission. The legislative and judicial history culminating in the Act need not now be detailed. See *United States* v. *Chicago Heights Trucking Co.*, 310 U. S. 344 (1940); *Acme Fast Freight, Inc.* v. *United States*, 30 F. Supp. 968, aff'd 309 U. S. 638 (1940).

---

[1] 56 Stat. 284, 49 U. S. C. § 1001 *et seq.*

Freight forwarders consolidate less-than-carload freight into carloads for shipment by rail, truck, or water. Their charges approximate rail less-than-carload rates; their expenses and profits are derived from the spread between the carload and l. c. l. rates. Forwarders are utilized by l. c. l. shippers because of the speed and efficiency with which they handle shipments, the unity of responsibility obtained, and certain services which forwarders make available.[2]

Forwarders are required by § 413 of the Act, 49 U. S. C. § 1013, to issue bills of lading to their customers, covering the individual package shipment from time of receipt until delivery to the ultimate consignee. When the freight is consolidated into carloads, the railroad gives the forwarder its bill of lading in which the forwarder is designated as both consignor and consignee. The contents are noted as "one carload of mixed merchandise" and usually move under an "all-commodity" carload rate. The destination set out in the railroad bill of lading is the forwarder's break-bulk point. At that point the carload is broken up; some shipments may be distributed locally, some sent by truck to off-line destinations, and some consolidated into carloads for reshipment to further break-bulk points. The railroad has no knowledge of the contents of the car, the identity of the individual shippers, or the ultimate destinations of the consignments. The forwarder has an unqualified right to select the carrier and route for the transportation of the freight.

The forwarder thus has some of the characteristics of both carrier and shipper. In its relations with its customers, a forwarder is subjected by the Act to many of the requirements and regulations applicable to common

---

[2] For a full description of freight forwarder practices, see *United States* v. *Chicago Heights Trucking Co.*, 310 U. S. 344 (1940); *Freight Forwarding Investigation*, 229 I. C. C. 201; *Bills of Lading of Freight Forwarders*, 259 I. C. C. 277.

carriers under Parts I, II, and III of the Act. In its relations with these carriers, however, the status of the forwarder is still that of shipper. It is this duality of character that raises the question in this case.

Section 1013 [3] provides that the Carmack Amendment, 34 Stat. 593, as amended, 49 U. S. C. § 20 (11) [4] and

---

[3] "§ 1013. *Bills of lading and delivery of property.* The provisions of section 20 (11) and (12) of this title, together with such other provisions of chapter 1 of this title (including penalties) as may be necessary for the enforcement of such provisions, shall apply with respect to freight forwarders, in the case of service subject to this chapter, with like force and effect as in the case of those persons to which such provisions are specifically applicable, and the freight forwarder shall be deemed both the receiving and delivering transportation company for the purposes of section 20 (11) and (12) of this title. When the services of a common carrier by motor vehicle subject to chapter 8 of this title are utilized by a freight forwarder for the receiving of property from a consignor in service subject to this chapter, such carrier may, with the consent of the freight forwarder, execute the bill of lading or shipping receipt for the freight forwarder. When the services of a common carrier by motor vehicle subject to chapter 8 of this title are utilized by a freight forwarder for the delivery of property to the consignee named in the freight forwarder's bill of lading, shipping receipt, or freight bill, the property may, with the consent of the freight forwarder, be delivered on the freight bill, and receipted for on the delivery receipt, of the freight forwarder."

[4] So far as pertinent here, § 20 (11) provides: *"Liability of initial and delivering carrier for loss; limitation of liability; notice and filing of claim.* Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation . . . shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, . . . and any such common carrier, railroad, or transportation company so receiving property for transportation . . . shall be liable to the lawful holder of said receipt or

(12),[5] shall apply to freight forwarders "in the case of service subject to this chapter" (Part IV), and that the freight forwarder shall be deemed both the receiving and delivering transportation company for the purposes of such § 20 (11) and (12). Incorporation of the Carmack Amendment requires, as has been noted, that the forwarder issue bills of lading to its shippers, covering transportation of the individual shipments to their ultimate destinations. There can be no question but that under § 20 (11), the forwarder is liable to its shipper for loss or damage to the freight exactly as if it were an initial carrier subject to Parts I, II, and III. We are now asked to decide whether the right-over given by § 20 (12) to an initial carrier against its connecting carriers applies in the case of forwarders who have paid loss and damage claims to their shippers and seek recompense from the carrier responsible for the loss.

In this action, respondent freight forwarder sought a declaratory judgment that it is not bound by the nine-month limitation period provided in the railroad bill of lading for the filing of loss or damage claims. If § 1013, by its incorporation of § 20 (11) and (12), makes the forwarder an initial carrier with a right-over against

---

bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not . . .: *Provided further,* That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law . . . ."

[5] Section 20 (12) provides: *"Recovery by initial or delivering carrier from connecting carrier.* The common carrier, railroad, or transportation company issuing such receipt or bill of lading, or delivering such property so received and transported shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained, the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

the carrier responsible for the loss or damage, the nine-month period is not applicable. If, however, the forwarder is still a shipper *vis-à-vis* the railroads, it must file its claims within the period specified in the railroad bill of lading.[6] The District Court held, on an agreed statement of facts, that the forwarder must file its claims within the nine-month period. The Court of Appeals for the Second Circuit reversed, holding that for the purposes of § 1013 alone forwarders are to be considered carriers and as such are entitled to the right-over given by § 20 (12). 166 F. 2d 778. We granted the petition for a writ of certiorari, 335 U. S. 807, to resolve this important question under Part IV of the Interstate Commerce Act.

*First.* The railroads contend that Part IV of the Act was not intended to change the shipper-carrier relationship that had for many years existed between forwarder and railroad. Their position is that while the previously prevailing duties and responsibilities owed by the forwarder to the public were changed by the Act, the language of the Act and its legislative history negative the forwarder's claim to carrier status. They read the language of § 1013, that "the provisions of section 20 (11) and (12) of this title . . . shall apply with respect to freight forwarders, in the case of service subject to this chapter . . .," to mean that, while the forwarder is liable to its shippers under § 20 (11) for loss or damage no matter whose the ultimate responsibility, its right-over under § 20 (12) is limited to losses or damage occurring

---

[6] Petitioners also make the contention that even assuming the forwarder is an initial carrier with right-over under § 20 (12), the limitation period provided in § 2 (b) of the railroad bill of lading is effective to modify that right. They point to numerous modifications of the right-over in the Freight Claims Rules applicable to railroads *inter se.* And see Article I (a) of Principles and Practices for the Investigation and Disposition of Freight Claims. Under the view we take of the case, it is unnecessary to reach that question.

in "service subject to this chapter"—*i. e.*, in the business of forwarding freight. Thus limited, the right-over would apply as against other freight forwarders with whom joint loading agreements authorized by § 1004 (d) were in effect, and against motor carriers who are permitted by § 1013 to issue bills of lading on behalf of the forwarders. The right-over would not, however, apply against railroads, water carriers, and line-haul motor carriers.

"Service subject to this chapter" is defined in § 1002 as "any or all of the service in connection with the transportation in interstate commerce which any person undertakes to perform or provide as a freight forwarder . . . ." While use of the word, "provide," lends some support to respondent's thesis that the definition should be read broadly to include the service performed by common carriers for the forwarders, the House Committee report indicates the contrary. It defines "service subject to this chapter" as:

> "the term used throughout part IV when referring to the business or operations of freight forwarders which it is proposed to regulate. The definition is intended to be broad enough to cover *everything the freight forwarder* does, in connection with forwarding by surface facilities, in the course of carrying out his undertaking to the shipper whom he serves. On the other hand, it is not broad enough, of course, to bring under regulation, under part IV, the service performed by the carriers whose services the freight forwarder utilizes in performing his undertaking." [7] (Italics added.)

The emphasis supplied by the phrase is emphasis on the freight forwarder's activities, not upon the service performed by underlying carriers. Since the forwarder

---

[7] H. R. Rep. No. 1172, 77th Cong., 1st Sess., p. 6.

contracts with its shipper to deliver the shipment safely to its ultimate destination, its undertaking is obviously part of the "service subject to this chapter." But inclusion of that phrase in § 1013 indicates a limitation of applicability of the right-over under § 20 (12) to the forwarder's business, which, we are told by the House Report, does not include "the service performed by the carriers whose services the freight forwarder utilizes in performing his undertaking."

The importance of the phrase, "service subject to this chapter," in the Freight Forwarder Act is accentuated by a contemporaneous amendment to Part II of the Interstate Commerce Act, which pertains to motor carriers. The Motor Carrier Act had made § 20 (11) applicable to motor carriers but had omitted § 20 (12). As a part of the Freight Forwarder legislation, Congress amended § 219 of the Interstate Commerce Act to make § 20 (12) applicable to motor carriers. It did so without including the qualifying phrase. The amendment reads simply:

"Sec. 219. The provisions of section 20 (11) and (12) of this Act, together with such other provisions of such part (including penalties) as may be necessary for the enforcement of such provisions, shall apply with respect to common carriers by motor vehicle with like force and effect as in the case of those persons to which such provisions are specifically applicable." 56 Stat. 300.

Unless we are to assume that Congress, in enacting § 1013, included the phrase, "in the case of service subject to this chapter," for no purpose whatsoever, while at the same time approving a similar section which did not include the qualifying phrase, we must give it the effect contended for by petitioners. Respondent suggests no other.

That meaning is supported by the explanation of § 1013 given by Representative Wolverton, a member of the

committee which drafted the section. However, doubt is cast upon the correctness of this interpretation by a contrary statement in the House Committee report. This report states flatly that "in case the loss of or damage to the property transported occurs on the line of a carrier whose service the freight forwarder utilizes, the freight forwarder will have the right of subrogation against the carrier under section 20 (12)." [8]

We are warned, however, that the report is to be discounted in some particulars. Representative Wolverton prefaced his section-by-section analysis of the bill with this significant statement:

> "In some respects the report which accompanies this bill is not as complete as it might be. Due to limitations of time the report was not submitted to the members of the committee or subcommittee, and therefore it may not be out of place to include in these remarks some further explanations which may be helpful to the Members in their consideration of the measure. In a few instances, which will be mentioned later, the report may not be so phrased as to convey fully the sense of what was intended." [9]

That he had § 1013 specifically in mind is clearly shown by his remarks explaining that section:

> "In its explanation of section 413 [§ 1013], the report which accompanied the bill is not strictly accurate in interpreting the intended legal effect of making section 20 (11) and (12) of part I applicable to freight forwarders. It should be understood that, insofar as a given service to its shipper is covered by the published rate of a freight forwarder, the latter is the only person to which such shipper is entitled to look for recovery of damages, and it is

---

[8] *Id.* at 15.
[9] 87 Cong. Rec. 8216.

in this sense that the forwarder is to 'be deemed both the receiving and delivering transportation company.' If damage to a shipment occurs on the line of a common carrier whose services are being utilized by the forwarder, the forwarder has no right of subrogation under section 20 (12), since its own shipper never had any right of action against such carrier. The forwarder's recovery against the carrier would be upon the bill of lading issued to it by such carrier and under the provisions of law applicable thereto. The reference to paragraph (12) of section 20 was included in section 413 [§ 1013] to cover a combination of services performed directly for the owner of the goods, such as would occur where the services of two or more forwarders were involved." [10]

In weighing the relative importance of this statement and the committee report, a number of additional facts assume importance. The bill under consideration was reported unanimously by the House Committee on Interstate and Foreign Commerce.[11] Congressman Wolverton, who was the ranking minority member of the committee, spoke in behalf of the bill and presented the only extended exposition of its provisions. His explanation of its meaning was not challenged or contradicted by any member of the committee. On the contrary, his part in its draft-

---

[10] 87 Cong. Rec. 8220.

[11] It should be noted that, although the debate technically concerned a bill already passed by the Senate (S. 210), the House Committee on Interstate and Foreign Commerce had struck everything following the enacting clause, so the measure actually under consideration was a House amendment. This amendment was made the basis of the bill reported by the conference, and § 1013 was carried over intact from the House amendment. The conference report was adopted by both houses with little debate.

ing was recognized by the chairman of the committee,[12] and his remarks have been quoted as authority by the Interstate Commerce Commission.[13]

In this posture of events, the committee report can be given little weight. A report not previously submitted to members of the committee and expressly contradicted without challenge on the floor of the House by a ranking member of the committee can hardly be considered authoritative. The Committee of Conference, of which Representative Wolverton was a member, adopted § 1013 exactly as it appeared in the House amendment. It bore, at that time, the gloss placed upon it on the floor of the House.[14] Under those circumstances, we cannot construe

[12] "Mr. LEA. . . . The gentleman from New Jersey [Mr. WOLVERTON], as the ranking minority member, gave unstinted work to these problems and with an ability of which every member of the committee is well aware. I appreciate his good support of this measure today as well as the fine contributions he has made to other important measures we have brought to the House in recent years." 87 Cong. Rec. 8227. Later, during debate on the bill reported by the conference, Chairman Lea said: "I particularly commend the services of the gentleman from New Jersey [Mr. WOLVERTON] who has given much of his time, experience, and ability to this measure. It is fortunate for this country that this body has Members so well qualified by experience and ability to give such service to the Nation." 88 Cong. Rec. 4064.

[13] *Pacific Coast Wholesalers' Association, Investigation of Status,* 269 I. C. C. 504, 513.

[14] In debate on the bill reported out of conference, Representative Wolverton gave a detailed explanation of the changes made by the Committee of Conference in the House amendment to S. 210. He did not comment specifically on the sections which had not been changed in conference, but said: "In general, the balance of the bill now presented is substantially identical with that which was passed by the House on October 23, 1941. At that time I explained and commented on its principal provisions, and, to the extent that they are retained in the present measure, what I there said of them still remains applicable." 88 Cong. Rec. 4068.

the statute to give forwarders the right-over against underlying carriers under § 20 (12).

*Second.* Such a construction would, moreover, be out of harmony with the previously existing relationship between forwarders and carriers regulated by Parts I, II, and III of the Interstate Commerce Act, a relationship which Part IV unquestionably accepted and continued. Prior to the enactment of the Forwarder Act, this Court held in a number of cases that forwarders are shippers insofar as carriers are concerned, and that the latter cannot discriminate in favor of or against forwarders, nor enter into joint or proportional rates with them absent legislative authority. *Interstate Commerce Commission* v. *Delaware, L. & W. R. Co.,* 220 U. S. 235 (1911); *Great Northern R. Co.* v. *O'Connor,* 232 U. S. 508 (1914); *Lehigh Valley R. Co.* v. *United States,* 243 U. S. 444 (1917); *United States* v. *Chicago Heights Trucking Co., supra; Acme Fast Freight* v. *United States, supra.*

It is clear that this relationship was not altered by the enactment of Part IV. Nowhere in the Act are freight forwarders referred to as carriers. Congress defined the term "freight forwarder" in § 1002 (5) to mean any person which "otherwise than as a carrier subject to" Part I, II, or III of this title consolidates goods for shipment, etc. In one section where, by inadvertence, forwarders were referred to as carriers, an amendment was passed less than two months later striking out "carrier" and substituting "freight forwarder." [15] The statements by

---

[15] In explanation of this amendment (S. 2642) to § 1017 (b), Senator Reed said: "When we passed the so-called freight forwarders' legislation there was some question as to whether or not a freight forwarder was a common carrier. The Senate bill offered no difficulty with that subject. We did not treat a freight forwarder as a common carrier. We passed Senate bill 210, which went to the House and was referred to the Committee on Interstate and Foreign Commerce. In the House there were a number of bills dealing with the

committee members on the floor of the House [16] leave no doubt that it was not the intent of Congress to alter the forwarders' status as shippers *vis-à-vis* carriers by rail, highway, and water.

The fact that Congress studiously avoided characterizing forwarders as carriers, while at the same time subjecting them to many of the duties and responsibilities of such carriers, serves to emphasize the distinction drawn by the Act. The reason for this distinction has already been suggested. In their relations with shippers, forwarders unquestionably perform functions and have duties similar to the functions and duties of common carriers. Their activities are not essentially different from those of express companies, which are common carriers by definition, under § 1 (3) of the Interstate Commerce Act, 49 U. S. C. § 1 (3). Nevertheless, Congress recog-

subject. The House struck out everything after the enacting clause and substituted one of its own bills.

"When the conference committee finished its work we thought we had a perfect bill. Later it was found that the drafting service had made a mistake as to one word, so Senate bill 2642 was introduced for the purpose of correcting that error. At one place in the bill which was passed reference was made to a freight forwarder as a carrier. We desire to correct that reference." 88 Cong. Rec. 6115.

[16] Mr. Youngdahl: "Close analysis developed that in many respects freight forwarders, as regards their relations with the actual carriers, are properly to be considered not as carriers but as shippers, and because of this essential difference in character it became necessary to recommend a form of legislation in keeping with that character. Only so, could gross discriminations against other shippers be avoided." 87 Cong. Rec. 8223.

Mr. Wolverton: "Even though they may assume or incur the obligations of a common carrier toward their own shippers, forwarders nevertheless stand in the role of shippers with respect to the actual carriers whose services they utilize." 88 Cong. Rec. 4065. See also, to the same effect, *J. R. Kelly Freight Forwarder Application,* 260 I. C. C. 315, 321. And see *Freight Forwarding Investigation,* 229 I. C. C. 201, 297–304.

nized that forwarders occupy a different position in their dealings with the carriers whose services they utilize.[17] For that reason, they refused to sanction the joint rates that forwarders had established with certain motor carriers. See *Acme Fast Freight, Inc.* v. *United States, supra.* According to Representative Wolverton's statement on the floor of the House, "it would be illogical and anomalous to permit the making of so-called joint rates in such a situation. The maintenance of a joint rate by a carrier and a shipper would be an absurdity. If nevertheless permitted, it would enable such shipper to receive rebates through the medium of divisions of the joint rate." [18] Carriers subject to Parts I, II, and III were permitted by § 1008 to establish so-called "assem-

---

[17] That the relation between express companies and underlying carriers is much different than the relations between forwarders and such carriers is clearly indicated in a letter from the Interstate Commerce Commission to Chairman Lea of the House Committee on Interstate and Foreign Commerce, which appears at p. 42 of the Hearings before that Committee on H. R. 2764, 79th Cong., 1st Sess. The Commission there said, p. 43: "There is a vast distinction between the relations of forwarders and the Express Agency to the underlying carriers. The Express Agency has an identical contract with each railroad, which would not be true of the forwarder. The profits, if any, accrue to the railroads, whereas under the forwarder arrangement the profits would accrue, as they do now under the joint rates, to the forwarders. The routing of express shipments, although in the control of the Express Agency, must of necessity depend primarily upon available train service rather than upon solicitation by, or concessions from, the transporting carrier, whereas concessions in the amount of compensation to the carrier would be the most important factor in the case of the forwarder. Thus, the considerations which led to the adoption of laws prohibiting unjust discrimination and undue prejudice and preference as between large and influential shippers on the one hand, and smaller shippers on the other, are practically absent in express service, but are highly prominent in forwarder service."

[18] 87 Cong. Rec. 8218.

bling and distribution" rates, which were designed to give the forwarder the benefit of rates lower than those available to other shippers, because of savings to the carriers effected by some services performed by the forwarder. This was thought to be consistent with the position of the forwarder as shipper, however, and such rates could not be lowered beyond an amount which would reflect the savings. It is significant, too, that these rates were not applicable to line-haul or carload freight, but only to the services performed by carriers in bringing less-than-carload shipments from off-line points to the forwarder's concentration point and from break-bulk point to final destination.[19] It is therefore clear beyond argument that Congress intended to preserve the existing shipper-carrier relationship between forwarders and those carriers regulated by Parts I, II, and III of the Act.

*Third.* The Court of Appeals, while conceding that forwarders are still shippers *vis-à-vis* carriers under the Act, held that for the purposes of § 1013 alone, they are to be regarded as initial carriers, while the railroads, motor vehicles, and boats whose services are utilized by forwarders are to be considered connecting carriers. Respondent goes farther. It contends not only that the liability provisions of the uniform rail bill of lading issued to the forwarder for his carload shipment may be disregarded, but that the railroad need not issue its bill of lading at all. In its view, *Missouri, Kansas & Texas*

---

[19] Under § 1009, forwarders were permitted to continue operation under joint rates previously established with motor carriers for eighteen months from the date of enactment of Part IV. This provision was thought necessary "In order to provide a reasonable period of adjustment within which rates and charges may be established pursuant to the provisions of section [1008]." Section 1009 was amended by the Act of February 19, 1946, 60 Stat. 21, to permit the filing of joint rates between forwarders and motor carriers under certain circumstances.

*R. Co.* v. *Ward,* 244 U. S. 383 (1917), which struck down conditions in the bill of lading issued without consideration by a connecting carrier, is decisive of the invalidity of the conditions imposed by the rail bill of lading here in controversy.

We do not agree, nor can we believe that the contention is seriously made. The underlying carrier's haul involves a different shipment, a different consideration, a different origin, a different destination, and a different consignor and consignee than are involved in the forwarder's undertaking. Furthermore, respondent's contention leads to the conclusion that railroads, whose bills of lading have long been prescribed by the I. C. C. and filed with rail tariffs, must transport freight on bills of lading subject to change at will by the forwarder and possibly different in many respects from the uniform rail bill. See *e. g., Chain Deliveries Express, Inc.,* 260 I. C. C. 149, 151 (1943). That certainly has not been the position taken by the I. C. C. since enactment of Part IV,[20] nor was the contention accepted by either of the courts below in this case.

The real issue is whether, granting that both forwarder and underlying carrier must issue bills of lading, the liability provisions of bills issued by the latter are to be considered null and void when forwarder freight is being hauled. We think that the whole scheme of the Act, its language and history, negative that proposition. As has been noted, the forwarder remains a shipper in its relations with underlying carriers under the Act. It is a shipper to whom carriers are forbidden to give any undue or unreasonable preference *in any respect whatsoever,* under the specific provisions of the Act. § 1004 (c).

---

[20] See *e. g., Twin City Shippers Association Freight Forwarder Application,* 260 I. C. C. 307, 309.

On the other hand, forwarders, like other shippers, may discriminate as they choose between carriers. § 1004 (b).

If the liability provisions of the carrier bill of lading are inapplicable, other difficulties are presented. Since they are not bound to use the uniform bill of lading, forwarders may adopt a limitation period for the submission of claims longer than nine months, the minimum period permitted by § 20 (11). Since the rail bill of lading, which prescribes a nine-month period, would apply to all shippers other than shippers by freight forwarder, the former would thus be discriminated against contrary to § 1004 (c).

Similarly, a shipper by freight forwarder might wish to contract for common-law liability by paying the higher tariff to the forwarder, as he must be permitted to do under § 20 (11). *Cincinnati, N. O. & T. P. R. Co.* v. *Rankin,* 241 U. S. 319 (1916). The forwarder, on the other hand, pays the lower declared value rate to the railroad for the carload shipment. If the shipment were lost or damaged, the shipper could undoubtedly recover its actual value from the forwarder, but under ordinary circumstances the latter would be confined to recovery from the railroad of a proportional part of the declared value of the carload shipment. Section 20 (12) provides, however, that the right-over is in the amount of the loss, damage, or injury as may be evidenced by any receipt, judgment, or transcript thereof. Under respondent's theory, its bill of lading would be controlling, and the forwarder would be entitled to full recovery despite the fact that it had contracted with the carrier at the reduced rate. This result is clearly contrary to *Great Northern R. Co.* v. *O'Connor, supra,* which was relied on by the Court of Appeals in the present case.

In addition, the factors which Congress felt made the original Carmack Amendment workable are totally absent

in the case of freight forwarders. Congressman Richardson, in explaining its purpose to the House, said:

"The reasons inducing us to do that [make the initial carrier liable for loss or damage] was that the initial carrier has a through-route connection with the secondary carrier, on whose route the loss occurred, and a settlement between them will be an easy matter, while the shipper would be at heavy expense in the institution of a suit. If a judgment is obtained against the initial carrier, no doubt exists but the secondary carrier would pay it at once. Why? Because the arrangement, the concert, the cooperation, the through-route courtesies between them would be broken up if prompt payment was not made. We have done that in conference." [21] See *Atlantic Coast Line R. Co.* v. *Riverside Mills,* 219 U. S. 186, 201 (1911).

The railroads have done exactly as was suggested. Elaborate freight-claim rules have been established covering the investigation, settlement, and defense of claims and the allocation of liability between carriers when, as is frequently the case, responsibility for loss or damage cannot be precisely ascertained. Arbitration boards settle disputes arising between carriers under the rules. As a practical matter, the right-over given by § 20 (12) is very little used by carriers, and indeed it is of no value when responsibility cannot definitely be placed upon any one carrier.

The considerations that made § 20 (12) workable as applied to railroads are not, however, applicable to freight forwarders. They enter into no "arrangements," "concerts," "cooperation," or "through-route courtesies" with railroads. As shippers they are forbidden by law to do

---

[21] 40 Cong. Rec. 9580.

so. Furthermore, the forwarder will always be in the position of a receiving or delivering carrier seeking the right-over against "connecting" carriers, never in the position of a carrier against whom the right-over is asserted. A railroad against which a claim has been filed as receiving or delivering carrier will ordinarily represent the connecting carrier as if no right-over existed, since it must depend in other cases upon similar representation by other roads. Details of such representation are, in fact, prescribed by the Freight Claim Rules, which are subscribed to by nearly all railroads. But the forwarder is always its own representative, and as between its customer, the shipper, and an underlying carrier allegedly responsible for loss or damage, the forwarder's tendency would naturally be to placate the former at the expense of the latter if the right-over existed and was applicable. These facts are, we feel, persuasive that Congress meant the right-over given in § 1013 to extend no farther than to actions against those with whom forwarders are permitted to enter into cooperative arrangements—*i. e.,* against those to whom the forwarder does not bear the relation of shipper.

*Fourth.* Two arguments are made as to the inequity that will result from requiring forwarders to comply with the requirements of § 20 (11) without giving them the rights of initial carriers under § 20 (12). It is said that Congress could not have intended to make the forwarder an insurer of freight while requiring at the same time that it file and prove claims against carriers as if it were an ordinary shipper. Secondly, it is argued that the forwarder must, under § 20 (11), allow at least nine months for the filing of claims by shippers, and if the forwarder is subject to a similar limitation period, there will necessarily be some claims filed by shippers at the end of the period which the forwarder will not be able to refile against the carrier in time.

The first contention is the result of a serious misconception as to the liability of freight forwarders prior to enactment of Part IV. This misconception is based on a failure to distinguish between two very different kinds of "forwarders." [22] The term was originally applied to persons who arrange for the transportation by common carrier of the shipper's goods. The forwarder did not necessarily consolidate the individual consignments into carload lots, and its duties, as agent of the shipper, went no farther than procuring transportation by carrier and handling the details of shipment. Forwarders of this type charged fees for their services, which the shipper paid in addition to the freight charges of the carrier utilized for the actual transportation.

Later, a different type of forwarding service was offered. This forwarder picked up the less-than-carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination. The freight forwarder charged a rate covering the entire transportation and made its profit by consolidating the shipment with others in carload quantities to take advantage of the spread between carload and l. c. l. rates. It held itself out not merely to arrange with common carriers for the transportation of the goods, but rather to deliver them safely to the consignee. The shipper seldom if ever knew which carrier would be utilized in the carriage of his shipment.

This difference in function was recognized very early by the courts, and differing standards of liability were imposed. When goods handled by an agent-forwarder were lost or damaged, it was liable to the shipper only for its own negligence, including negligence in selecting

---

[22] See 1 Hutchinson on Carriers (3d ed.) §§ 71, 80–84; Bunge, Law of Draymen, Freight Forwarders and Warehousemen, p. 111.

a carrier.[23]   If, on the other hand, the shipment had been entrusted to a forwarder of the second type—*i. e.,* one who contracted to deliver the goods to the consignee at rates set by itself—the forwarder was subjected to common carrier liability for loss or damage whether it or an underlying carrier had been at fault.[24]   The fact that the forwarder did not own the carriers whose services it utilized was held to be immaterial.   Its undertaking was to deliver the shipment safely at the destination.   Common carrier liability was the penalty for failure of fulfilment of that undertaking.

The Freight Forwarder Act encompasses only the second type of forwarder described above.   Section 1002 (a) (5) defines "freight forwarder" as

> "Any person which . . . holds itself out to the general public to transport or provide transportation of property . . . and which, in the ordinary and usual

---

[23] *Krender* v. *Woolcott,* 1 Hilt. (N. Y.) 223 (1856); *Heath* v. *Judson Freight Forwarding Co.,* 47 Cal. App. 426, 190 P. 839 (1920); *Mansfield* v. *Chicago Title & Trust Co.,* 199 F. 95 (1912).

[24] The distinction is made in a number of cases, of which the following is typical:

"The defendants were not forwarders, but carriers. . . . A simple engagement to forward goods at New York, marked for a particular destination, is discharged by shipping the goods, by the usual or most direct conveyance, to the place designated; but an agreement to forward them from New York to the place of destination, the charge for freight for the whole distance being specified in the agreement, is very different. It is an agreement to carry them for that distance, or to be responsible for their safe carriage and delivery at the place designated in the agreement." *Krender* v. *Woolcott,* 1 Hilt. (N. Y.) 223, 227 (1856).   See also, *Christenson* v. *American Express Co.,* 15 Minn. 270 (1870); *Bare* v. *American Forwarding Co.,* 146 Ill. App. 388 (1909); *Kettenhofen* v. *Globe Transfer & Storage Co.,* 70 Wash. 645, 127 P. 295 (1912); *Highway Freight Forwarding Co.* v. *Public Service Comm'n,* 108 Pa. Super. Ct. 178, 164 A. 835 (1933).

course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) *assumes responsibility for the transportation of such property from point of receipt to point of destination,* and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8, or 12 of this title." [25]  (Italics added.)

As to this group, as has been pointed out, the liability of common carrier to its shippers has always been the rule. By making § 20 (11) applicable to these forwarders, Congress did two things: (1) required forwarders to issue bills of lading; [26] and (2) made a matter of federal law what had been uniformly adopted by the states as the rule of liability for loss or damage. As applied to railroads, the Carmack Amendment made a significant change, since it prevented the initial carrier from exercising the right given by decision in a majority of states to limit its liability to loss or damage occurring on its own lines. But that right had never been granted to forwarders of the type regulated by Part IV. Their liability has, from the beginning, been extended to loss or damage to the con-

---

[25] For discussion of the problem of assumption of responsibility for the through transportation of property by freight forwarders, see *Judson-Sheldon Corp. Application,* 260 I. C. C. 473; *Universal Transcontinental Corp. Application,* 260 I. C. C. 521; *J. Nelson Kagarise Application,* 260 I. C. C. 745. Cf. *United States* v. *American Union Transport, Inc.,* 327 U. S. 437 (1946).

[26] Section 20 (11), of course, also includes the Cummins Amendments, 38 Stat. 1196 and 39 Stat. 441, which relate to limitation of liability to the declared value of the shipment. The section adds no new liability, however, to that previously borne by the forwarder.

signment occurring at any time between pick-up at the point of origin and delivery at destination. As shippers, they have, of course, always had a right of action against the underlying carrier at fault. The defense that the goods are not those of the forwarder is not open to the carrier, since, as we have held, the carrier is not concerned with questions of ownership, but must treat the forwarder as shipper. *Interstate Commerce Commission* v. *Delaware, L. & W. R. Co., supra.*

The Act thus leaves the freight forwarder in substantially the same position it had previously held with respect to its liability to shippers and its rights against underlying carriers. The hearings, committee reports and debates are bare of any suggestion that forwarders needed relief from the requirement that they file their claims against carriers like other shippers. They have done so for over a century. They have continued to do so since enactment of the Freight Forwarder Act. See, *e. g., Merchant Shippers Assn.* v. *Kellogg Express & Draying Co.,* 28 Cal. 2d 594, 170 P. 2d 923 (1946); *J. R. Kelly Freight Forwarder Application,* 260 I. C. C. 315, 318 (1944); *Hugh F. Gannon, Inc., Freight Forwarder Application,* 260 I. C. C. 219, 220 (1944). We would require a much clearer showing than has been made to find that Congress intended, without increasing the liabilities of forwarders regulated by the Act, to give them a right-over against railroads, ship lines, and line-haul motor carriers as initial carriers under § 20 (12).[27]

---

[27] The Court of Appeals rejected Representative Wolverton's analysis of § 1013 as based on the erroneous premise that the shipper by freight forwarder never had any right of action against the carrier, and therefore the forwarder can have no right of subrogation under § 20 (12). The court felt that this rationale indicates a withdrawal of the shipper's common-law right of recovery against the responsible carrier, and consequently the placing of the forwarder in the position

It is true that under the provisions of § 20 (11) forwarders are now forbidden to limit the period within which claims must be filed by shippers to less than nine months.   If forwarders must, in turn, file claims with

of an insurer with no right against the carrier responsible for loss or damage.

We do not so read that analysis.   Of course shippers by freight forwarder have for many years been permitted to sue underlying carriers for loss or damage occasioned by the latter.   *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344 (1848) ; *Great Northern R. Co.* v. *O'Connor*, 232 U. S. 508 (1914).   The theory of these actions was that the shipper is the undisclosed principal of its agent, the forwarder, in the latter's contract with the carrier.   The forwarder, as agent of an undisclosed principal, could, of course, sue on the contract.   *Merchant Shippers Association* v. *Kellogg Express & Draying Co.*, 28 Cal. 2d 594, 170 P. 2d 923.   See Bunge, Law of Draymen, Freight Forwarders and Warehousemen, p. 117.   See also Restatement of Agency, §§ 322, 364.   On the other hand, when a shipper sued a connecting carrier for loss of goods delivered to an initial carrier by railroad, it did so as a *disclosed* principal. The initial carrier, like the forwarder, acted as agent to contract with the connecting carrier for carriage of goods on the latter's lines, but since it acted for a disclosed principal, it was not a party to the contract.   See *Bichlmeir* v. *Minneapolis, St. P. & S. S. M. R. Co.*, 159 Wis. 404, 150 N. W. 508 (1915) ; 1 Roberts, Federal Liabilities of Carriers, § 386.   See also Restatement of Agency § 320.

When the Carmack Amendment was passed, the theory of the liability imposed upon the initial carrier was that it became a principal and all its connecting carriers agents for the transportation of the goods.   *Northern Pacific R. Co.* v. *Wall*, 241 U. S. 87 (1916) ; *Atlantic Coast Line R. Co.* v. *Riverside Mills*, 219 U. S. 186 (1911). Since the initial carrier, unlike the forwarder, did not have a contract right of action against its connecting carriers (*i. e.* was not a shipper), § 20 (12) was passed to insure that the burden would fall on the carrier responsible for the loss.   The forwarder, however, is a party to the contract with the carrier.   It has no need for subrogation to the shipper's rights, as Representative Wolverton indicated.   Its recovery against the carrier has always been upon "the bill of lading issued to it by such carrier and under the provisions of law applicable thereto."   That right remains.

carriers within nine months, respondent contends that in the case of claims filed against a forwarder during the last day or two of the period, it will not have enough time to refile the claim with the proper carrier and will thus have no recourse after having paid the claim. This objection obviously applies to an insignificant proportion of the total claims. Furthermore, if the Interstate Commerce Commission considers the matter to be of sufficient importance, it has the experience and authority to prescribe the proper corrective. In any event, this single inconsistency is hardly sufficient to justify the contention that Congress intended that § 1013 be interpreted to make the forwarder an initial carrier with right-over against common carriers who must treat the forwarder as a shipper for all purposes.

The decision of the Court of Appeals is

*Reversed.*

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE RUTLEDGE would affirm the judgment for reasons stated by Judge Frank, writing for the Court of Appeals. See 166 F. 2d 778.