CAIN-SLOAN COMPANY, Appellant-Plaintiff,

*v.*

LOUISVILLE AND NASHVILLE RAILROAD COMPANY,
Appellee-Defendant.

424 S.W.2d 787.

(*Nashville,* December Term, 1967.)

Opinion filed February 26, 1968.

72

WILLIAM THOMAS McHUGH, Nashville, for appellant-plaintiff; ABRAHAM DORF, New York City, of counsel.

HOOKER, KEEBLE, DODSON & HARRIS, and JOHN W. KELLEY, Nashville, for appellee-defendant; EUGENE W. HERDE, Louisville, Ky., of counsel.

Mᴿ Jᴜsᴛɪᴄᴇ Hᴜᴍᴘʜʀᴇʏs delivered the opinion of the Court.

This case is here on appeal from the Sixth Circuit Court of Davidson County, Tennessee, where judgment went to Louisville and Nashville, after it was submitted upon a stipulation of facts. Because it is a test case, determinative by agreement of two hundred and twenty-four similar lawsuits now pending in the Davidson County General Sessions Court, and because it is a case of first impression in this State, it has been given concerned consideration. All errors against the judgment have been examined, and we have concluded the judgment must be affirmed.

This Court has been fortunate in the quality of the briefs and arguments of both Cain-Sloan Company and Louisville and Nashville Railroad Company, but particularly so in the memorandum prepared by Circuit Judge James M. Swiggart.

In broad outline the agreed facts are that Cain-Sloan purchased a carton of ladies rayon underwear from Superior Petticoat Company, New York, N. Y. This carton was taken to the Paramount Freight Handling Company, Inc., receiving station located at Pier 52, part of the B & O's West 26th Street Station, in New York. Under its published tariffs B & O provided only carload transportation to and from this station. However, under a separate terminal tariff it provided a stevedoring service of checking, coopering, sorting, storing, loading or unloading, upon request, for shippers and receivers of carload freight. The Superior Petticoat carton was accepted by Paramount which signed and issued a bill

of lading showing Superior Petticoat as the consignor, Cain-Sloan as the consignee, Paramount as the carrier, and described the shipment as a carton of ladies rayon underwear weighing one hundred and thirty-two pounds. Paramount intended to ship this carton as part of a carload destined to Mid-Tenn. Freight Association, a Nashville based organization. Mid-Tenn. had arranged for Osburn-Hessey Moving Company to break bulk at Nashville and to deliver the less carload shipments to the consignees in the less carload bills of lading issued by Paramount.

The carton was turned over to B & O which lost it in some manner before it was loaded in the car. Later in the day the rail car into which the carton was to have been loaded was fully loaded by B & O employees and Paramount released it for transportation as a carload of mixed merchandise.

B & O issued its bill of lading for the carload shipment, showing Paramount as shipper, Mid-Tenn. Freight Association as consignee, designating B & O and L & N as carriers, and describing the goods as a carload of mixed merchandise. L & N was the delivering carrier of the carload shipment, which did not contain the Superior Petticoat package. This carriage was at the reduced, carload rate.

Cain-Sloan sued L & N pursuant to 49 U.S.C.A. sec. 20(11). It did not sue Paramount, B & O, or Mid-Tenn.

Judge Swiggart's memorandum is in relevant part as follows:

"This cause is concerned with freight forwarders, their function in the transportation industry and the application of Section 49 U.S.C.A. 20(11), known as the Carmack

Amendment, to a freight forwarder under the circumstances of this case.

The business of a freight forwarder is well described in *Chicago, M., St. P. & Pac. R. Co., v. Acme Fast Freight,* 336 U.S. 465, [69 S.Ct. 692], 93 L. Ed. 817, which description applies to the stipulation in this case, as follows:

'Freight forwarders consolidate less than carload freight into carloads for shipment by rail, truck, or water. Their charges approximate rail less than carload rates; their expenses and profits are derived from the spread between the carload and l. c. l. rates. Forwarders are utilized by l. c. l. shippers because of the speed and efficiency with which they handle shipments, the unity of responsibility obtained, and certain services which forwarders make available.

'Forwarders are required by Section 413 of the Act, 49 U.S.C. Section 1013, to issue bills of lading to their customers, covering the individual package shipment from time of receipt until delivery to the ultimate consignee. When the freight is consolidated into carloads, the railroad gives forwarder its bill of lading in which the forwarder is designated as both consignor and consignee. The contents are noted as "one carload of mixed merchandise" and usually move under an "all-commodity" carload rate. The destination set out in the railroad bill of lading is the forwarder's break-bulk point. At that point the carload is broken up; some shipments may be distributed locally, some sent by truck to off-line destinations, and some consolidated into carloads for reshipment to further break-bulk points. The railroad has no knowledge of the contents of the car, the identity of the

individual shippers, or the ultimate destination of the consignments. The forwarder has an unqualified right to select the carrier and route for the transportation of the freight.'

'The forwarder has some of the characteristics of both carrier and shipper. In its relations with its customers, a forwarder is subjected by the Act (Section 1013) to many of the requirements and regulations applicable to common carriers * * *. In its relations with the carriers, however, the status of the forwarder is still that of shipper.'

Section 1013 mentioned in this quotation provides that the Carmack Amendment (Section 20(11)) shall apply to freight forwarders 'in the case of service subject to this chapter' and that the freight forwarder shall be deemed both the receiving and delivering transportation company for the purposes of the Carmack Amendment. There are certain principles determined by *Chicago, M., St. P. & Pac. R. Co. v. Acme Fast Freight,* supra, which are important here.

First, the Court adopted an explanation of the Forwarder Act (1013) given to the Congress as follows:

'It should be understood that, insofar as a given service to its shipper is covered by the published rate of a freight forwarder, the latter is the only person to which such shipper is entitled to look for recovery of damages, and it is in this sense that the forwarder is to be deemed both the receiving and delivering transportation company.' [336 U.S. 465, 69 S.Ct. 692] [93] L.Ed. 823.

Second, it is clear that the Forwarders Act did not change the existing decisions that the relationship be-

tween forwarder and carrier was that of shipper to carrier and not carrier to carrier.

Third, in their relationship with shippers, forwarders are carriers and have the liability of a receiving and delivering carrier created by the Carmack Amendment. This is the purpose of the Forwarders Act.

Fourth, the rate for carriage paid by the shipper to the forwarder is not a joint rate in which the carrier participates but is a separate rate. The forwarder in turn pays its separate rate or charge to the carrier.

Fifth, the underlying carrier's haul involves a different shipment, a different consideration, a different origin, a different destination and a different consignor and consignee than are involved in the forwarder's undertaking.

## PROPOSITION I.

The first proposition discussed in the briefs is whether the Plaintiff has a standing to sue. Plaintiff contends it has the right of an undisclosed principal. The Court is of the opinion that the Plaintiff is not a party to the bill of lading between forwarder and carrier within the meaning of the Carmack Amendment. Plaintiff's rights as an undisclosed principal cannot exceed its common law right of recovery against the carrier responsible for the loss. Stipulation 19 agrees that Defendant was not actually responsible for the loss. If liability exists it must be under the Carmack Amendment but Plaintiff is neither a party to the bill of lading by which Defendant accepted possible Carmack Amendment liability nor principal to the entire bill of lading. The carrier's bill of lading is not severable or equivalent to a series of separate and distinct contracts. Plaintiff would have

standing to pursue a common law right but there is no common law liability.

## PROPOSITION II.

The second proposition is whether there had been a delivery of the lost goods for shipment to the carriers before the loss occurred. Plaintiff contends that the B & O Railroad received this particular shipment as a carrier and Defendant contends it received the goods as warehouseman.

The stipulation is that Plaintiff's seller delivered the carton to Paramount Freight Handling, Inc., a forwarder, as receiving agent for Mid-Tenn Freight Association, a forwarder, at its place of business at Pier 52, North River, New York. Paramount issued a less than carload bill of lading. The carton and bill of lading was taken to a check for B & O Railroad who took possession of it. The carton was commingled with other cartons to be loaded by B & O personnel into rail boxcar B & O 270862.

During the day of January 20, 1961, said boxcar was fully loaded by B & O employees at the direction, but not under supervision, of Paramount, and was sealed. B & O made no record of the cartons actually loaded. The doors of this car were not opened until it reached Mid-Tenn at Nashville, at which time it was discovered that the carton was missing. It is stipulated that the carton was lost or stolen while in the physical possession of employees of B & O, and that it was never placed in the boxcar.

Plaintiff states in its brief: "It is uncontested that the merchandise was delivered to the B & O Railroad by Paramount for immediate shipment to Nashville, Ten-

nessee, and such delivery was made to the B & O in the regular course of its business.' It seems that railroads are not deemed common carriers in relation to property until such property has been delivered to them for immediate transportation, it has been accepted by the railroad for that purpose, and the shipper has released all control over it. *Ill. Cen. R. Co. v. Moore* [6 Cir.] 228 F.2d 783 [873]. It is obvious that Plaintiff's statement is contested as far as the term 'for immediate shipment' is concerned.

The stipulation reads, '9. Paramount utilizes the loading services of the Baltimore & Ohio Railroad Company at Pier 52 * * * to load the less-carload freight into rail cars * * *' and also, '10. The Baltimore & Ohio Railroad performs the receiving and stevedoring services of checking, coopering, sorting, storing by specific locations, and loading into boxcars under the provisions of the Trunk Line Territory Tariff 116-G, Rule A-199, Exception (A) (c)-(1). The Baltimore & Ohio Railroad is paid $5.09 for each 2,000 pounds of merchandise handled under the provisions of this tariff. These charges are in addition to any other charges it collects as a line-haul carrier in connection with carload transportation.'

In this regard, the tariffs are important. The terms of the bill of lading, Exhibit 9, issued by the B & O as carrier govern the transportation in regard to Defendant, so long as it is in accord with the tariffs approved by the I.C.C. and Section 20(11). The bill of lading issued to Superior Petticoat Co., also refers to the tariffs. Exhibit 8.

According to Tariff 116-G, Item 90, the B & O station which received this shipment 'is open for receipt and

delivery of carload freight only.' The emphasis is supplied by the tariff. This tariff is supplemented by Rule A-199, Exception A(c)(1) which authorizes the B & O to make a special charge for loading and unloading carload shipments when requested by the shipper, consignee, or owner of the freight. This exception does not authorize the B & O to handle less-than-carload shipments.

The Defendant accepted the carload shipment under Supplement 31 to Freight Tariff TN/S-156-J, Section 1, Item 175 from the B & O but was not a party to nor did it have knowledge of the B & O's participation in Tariff 116-G.

The Court holds that the railroad's status as common carrier is dependent upon receipt for immediate (as far as the shipper is concerned) shipment of the shipping unit envisioned by the rail bill of lading. This shipping unit was the loaded boxcar, not the individual package. It is stipulated that the individual package sued for never became part of the loaded boxcar. It is then not received by B & O for immediate shipment and B & O did not receive it as carrier.

Plaintiff's case of *Ill. Cent.* [*R. Co.*] *v. Moore,* 228 F.2d 873, may be distinguished on the basis that there the shipping unit was complete and the shipment sued for was beyond question a part of that unit.

## PROPOSITION III.

The Defendant's third proposition is that Defendant is not liable under the Carmack Amendment for the activities of the B & O, the initial carrier, before the B & O accepted the goods for immediate shipment.

The Court holds that the loss sued for occurred before acceptance for shipment and that the Carmack Amendment has no application to the transaction. This proposition is sustained.

## PROPOSITION IV.

Defendant contends in effect that a delivering carrier cannot be held liable under the Carmack Amendment for complete loss of goods without a showing that the goods had come into the physical possession of the delivering carrier. This point is subject to grave doubt. The purpose of the Amendment is to relieve the shipper of the burden of locating the situs of the actual loss. However, the Court is of the opinion that this point is not material to this decision.

## SUMMARY

In summary, the Court holds that where a shipper makes use of a freight forwarder under a less-than-carload bill of lading for shipment by it under a carload bill of lading, the shipper has a full and adequate remedy under the Freight Forwarders Act, 49 USC, Section 1013, and that his contract and remedies are under his own bill of lading issued by the forwarder and not under the carload bill of lading issued to the forwarder. Such a shipper cannot maintain an action under 49 USC 20(11) against a party to the carload bill of lading in the absence of a showing that the loss occurred in the hands or possession of the Defendant.

The Court, therefore, orders this action to be and same is dismissed at Plaintiff's cost.''

We are unable to agree with Cain-Sloan that the trial judge erred in treating Paramount as a freight for-

warder; and erred in his understanding and effect of the Acme Fast Freight case.

In the first place, Cain-Sloan's contention the case should be tried here as though Paramount was not a freight forwarder is contrary to the position it took in the trial court. In the course of the Circuit Court Judge's opinion he said:

"This cause is concerned with freight forwarders, their function in the transportation industry and the application of Section 49 U.S.C.A. 20(11), known as the Carmack Amendment, to a freight forwarder under the circumstances of this case."

In its motion for a new trial, Cain-Sloan assigned as its third ground the following:

"The Court erred in its finding, i. e., 'this cause is concerned with freight forwarders, their function in the transportation industry and the application of Section 49, U.S.C.A., 20(11) to a freight forwarder under the circumstances of this case.'

Plaintiff respectfully insists this cause is concerned with the rights of shippers or consignees holding less-than-carload bills of lading from a *freight forwarder* to maintain an action against a rail carrier for loss or damage to such shipment covered by such less-than-carload bill of lading. (Emphasis supplied.)"

█ Taking this position in the Circuit Court with respect to the status of Paramount as a freight forwarder, Cain-Sloan cannot change it in this Court. *Washington v. Atlanta Life Insurance Co.* (1940) 175 Tenn. 529, 136 S.W.2d 493, 129 A.L.R. 54; Rules of the Supreme Court of Tennessee, Rule 14(5).

However, we regard the taking of this position as no inadvertence on counsel's part, but as forced by the facts. Paramount is not only a freight consolidator as now insisted, it was a party principal to a freight forwarding shipment. Under the agreed facts, it consolidated packages at the origin terminal; contracted to deliver them to a destination; employed the services of line haul common carriers for the transportation of the carload of packages it had assembled; and was a party to an arrangement to break bulk and deliver the article to the consignee, Cain-Sloan.

█ This makes Paramount a "freight forwarder" as defined in 49 U.S.C.A. sec 1002.[1]

This definition also negates the contention Paramount is not a freight forwarder in that, unlike Acme, it did not break bulk and distribute to the ultimate consignee.

---

[1] "(5) The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapters 1, 8, or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8, or 12 of this title."

"(7) The term 'service subject to this chapter' means any or all of the service in connection with the transportation in interstate commerce which any person undertakes to perform or provide as a freight forwarder, or which such person is authorized or required by or under the authority of this chapter to perform or provide;".

As stated in the statute, these latter services need not actually be provided by the contracting party for that party to come under the act. It is obvious that any such restricted definition of a freight forwarder would leave the act ineffectual; to be avoided by any number of arrangements.

Consistently, the following is found in the holding of the Interstate Commerce Commission in 273 No. FF-C-7 Atlanta Shippers Association, Inc., Atlanta, Georgia, Investigation of Operations, decided January 6, 1964. The question was, whether Atlanta Shippers Association, Inc. was providing unauthorized and hence illegal freight forwarding services. The Commission said:

> "Briefly stated, the evidence adduced in these proceedings clearly establishes that, at least in its physical aspects, the service received by the shipper-members of ASA and FSA is identical to that ordinarily provided by a regulated forwarding company. Thus, for example, each Atlanta member of ASA, merely by directing its suppliers to deliver its shipments to designated consolidating agents (respondents **Paramount** Freight Handling, Inc., and Association Consolidators, Inc.) in New York City, Philadelphia, or Chicago, with appropriate routing instructions, obtains the benefit of a complete door-to-door transportation service in the course of which its individual less-than-carload shipments are assembled and consolidated with the freight of other shippers for movement by rail at carload rates to Atlanta, at which point break-bulk and distribution operations are performed by ASA and by respondent Atlanta Bonded Warehouse, Inc."

Upon this finding an order was entered as follows:

"Upon oral argument and reconsideration, we find in No. FF-C-7 that respondents Clyde T. Kilgore, Clyde H. Kilgore, Atlanta Bonded Warehouse, Inc., Association Consolidators, Inc., *Paramount Freight Handling, Inc., and Atlanta Shippers Association, Inc., acting in concert, have been and are engaged jointly in transporting or providing transportation of property in interstate commerce, for compensation, in the manner described in this report; that such operations have been and are unauthorized and in violation of section 410(a) of the Interstate Commerce Act;* and that an order should be entered requiring such respondents to cease and desist from the performance of such illegal operations and thereafter to refrain and abstain from engaging, jointly or severally, in such operations, unless and until there is in force and effect, with respect to such operations, appropriate authority therefor." (Emphasis added)

49 U.S.C.A. sec. 1013 provides that the provisions of Sections 20(11) and 20(12) of the Interstate Commerce Act, (the Carmack Amendment), shall apply to carriers involved in the arrangement of forwarding freight.[2]

In providing that a delivering freight forwarder shall have an action over and against an initial or connecting

---

[2] "The provisions of section 20(11) and (12) of this title, together with such other provisions of chapter 1 of this title (including penalties) as may be necessary for the enforcement of such provisions, shall apply with respect to freight forwarders, in the case of service subject to this chapter, with like force and effect as in the case of those persons to which such provisions are specifically applicable, and the freight forwarder shall be deemed both the receiving and delivering transportation company for the purposes of section 20(11) and (12) of this title."

freight forwarder and so be subrogated to the shipper it has reimbursed, the statute forces the conclusion that a freight forwarding transaction may be engaged in by several different persons acting in concert, with initial, connecting and delivering parties acting, and liable, as carriers.

■ In our opinion, Paramount, Mid-Tenn. Freight Association, and Osburn-Hessey Moving Company, were acting in concert, as a freight forwarding combination, so that Cain-Sloan's shipment came within both the protection and the strictures of the freight forwarder's amendment to the Interstate Commerce Act. 49 U.S.C.A. sec. 1001 et seq.

We find nothing to support the argument that B & O was a party to the making of the less-than-carload bill of lading by which Paramount contracted to deliver Cain-Sloan's carton to it in Nashville so that Cain-Sloan can recover on that contract. The whole intent of the parties to the transaction was to the contrary of this, and there is nothing substantial in the form in which the intent was evidenced to sustain a contrary conclusion.

Under this statute a freight forwarder is not the agent of the shipper to arrange carriage for it. It is only consistent with the conclusion the freight forwarder is a principal contracting with the shipper for the delivery of goods.

■ The liability imposed upon an initial carrier by the original Carmack Amendment is that of a principal, with all its connecting carriers, its agents for the transportation of the goods. *Northern Pacific Railway Co. v. Wall*, 241 U.S. 87, 36 S.Ct. 493, 60 L.Ed. 905 (1916); *Atlantic Coast Line R. Co. v Riverside Mills*, 219 U.S.

186, 31 S.Ct. 164, 55 L. Ed. 167 (1911). Sections 20(11) and 20(12) were enacted to permit the shipper to recover from it and to subrogate this principal to the claim of the shipper against the carrier responsible for a loss. The theory and purpose of the Freight Forwarders Act, by virtue of its adoption in toto of Sections 20(11) and 20 (12) is, in this respect, identical. The freight forwarder by law becomes the principal to carry or arrange for it, satisfaction being obtainable by the shipper against the freight forwarder at either the receiving or the delivering end of the carriage.

Under this arrangement there is no room for and by the owner as an undisclosed principal against the line haul carrier with whom the freight forwarders contract.

■ The Freight Forwarders Law makes the freight forwarder an independent contractor in making arrangements to forward the shipments it has collected together. As an independent contractor it is acting for itself in making the contract of carriage. So that it cannot be the agent of an undisclosed principal and on this theory one through whom, as is here attempted, the shipper or owner can trace liability to the line haul common carrier. This is what Congressman Wolverton had in mind in making the statement, quoted in Judge Swiggart's opinion, taken from Acme Fast Freight, that the shipper (and so the owner) could only sue the freight forwarder.

What we have said indicates we disagree with *Thompson, Trustee, International Great Northern Railroad Co. v. American Abrasive Metals Co.*, Texas Court of Civil Appeals, 253 S.W.2d 83. We think that court made a mistake of the same character made by the United States Court of Appeals for the Second Circuit in Acme Fast

Freight, reversed by the United States Supreme Court. It based its judgment upon a supposed misstatement of the common law as it was prior to the enactment of the Freight Forwarders Act, rather than upon an analysis of the changes effected by the Act in the relationships of all parties concerned. That this case was not reviewed by a superior court, should be accounted for by the statement in the opinion that the freight was actually damaged by the carrier sued, so that in any event the owner was entitled to recover ex delicto. It is fundamental that a carrier, as is anyone else, is liable in such an action for a wrongful injury.

█ Summarizing all we have said in simplest terms: Cain-Sloan's action, which is ex contractu, cannot be maintained against L & N because it is not a party to the bill of lading contract between Paramount, and L & N, either as a disclosed or undisclosed principal. Under the Freight Forwarders Act Cain-Sloan has an action on its contract against the forwarders of its freight.

█ We are of the opinion the Circuit Judge correctly sustained L & N's second ground of defense: that as the delivering carload carrier, L & N is not responsible for merchandise B & O lost while in its custody for stevedoring services. We agree with his interpretation of the stipulation, and application of the law.

█ It is settled law that common carriage does not begin until a *complete shipping unit* has been delivered to the receiving carrier for immediate transportation and the consignor has released all control over it. *Illinois Central Railroad v. Moore,* (Sixth Circuit 1956) 228 F.2d 873; *Adair v. Yazoo & M. V. R. Co.,* 142 Miss. 345, 107 So. 371 (1926).

█ The fact that the physical work of assembling the numerous packages into a carload was done by employees of B & O did not amount to receipt of the goods, since this work was stevedoring work under existing tariffs and B & O's carriage contract was for an assembled, loaded car.

We likewise concur in the Circuit Judge's holding that it was unnecessary to consider L & N's third defense: that it never received the shipment for transportation and so under the language of the Carmack Amendment it is not liable as a delivering carrier.

Having already held the Carmack Amendment did not come into operation against L & N, since B & O had lost Cain-Sloan's carton while performing stevedoring services under provisions of Trunk Line Territory Tariff 116-G Rule A-199, Exception A(c-1), this question was not before the Court for decision.

The judgment of the Circuit Court is affirmed.

BURNETT, CHIEF JUSTICE, and DYER, CHATTIN and CRESON, JUSTICES, concur.