HILL MFG. CO. v. NEW ORLEANS, M. & O. R. R. Co.

[78 South, 187, Division B.]

1. CARRIERS. *Carriage of freight. Issuance of bill of lading. Presumption.*

   The issuance of a bill of lading carries with it the presumption that the freight was delivered to the common carrier.

2. CARRIERS. *Carriage of freight. Commencement of liability as common carrier.*

   The test by which to determine whether or not freight was

delivered to the carrier for shipment is whether there was anything to be done by the shipper before the freight was to be shipped by the carrier.

3. SAME.

If the shipper must perform some service or do some act necessary, precedent to shipment, it would not be a delivery to the railroad as a common carrier. But if the shipper was to perform no further act, or if there was no further act or thing to be done by him, then it is a delivery to the railroad as a common carrier, although the railroad itself may have to have some act done or performed before the freight is actually ready for shipment.

4. SAME.

The liability of the railroad as a common carrier begins when the shipper has done all that is required of him and paid the proper charges.

5. CARRIERS. *Carriage of freight. Delivery to railroad as carrier.*

Where cotton was delivered by its owner to a railroad for shipment and the railroad collected the charges for compressing, and under its contract with the compress company, the cotton was to be compressed and prepared in a certain way. In such case there was a delivery to the railroad in its capacity of a common carrier, though it elected not to ship the cotton at once, but permitted it to stand in the warehouse to await its own convenience in shipping as it contracted to do in the bill of lading.

6. CARRIERS. *Carriage of goods. Contracts against negligence.*

A common carrier cannot contract against liability for its own negligence, for that would be against public policy.

7. CARRIERS. *Carriage of goods. Limited liability. Federal statutes.*

The Carmack Amendment to the Hepburn Act of 1906 (Act June 29, 1906, chapter 3591, section 7, pars 11, 12, 30 Stat. 595, U. S. Comp. St. 1916, sections 8604A, 8604aa), amending the Interstate Commerce Act of Feb. 4, 1887 (24 Stat. 379, chapter 104), makes a common carrier liable for some value in case of a shipment under a limited liability contract.

8. CARRIERS. *Carriage of goods. Limited liability. Alternative rate on file.*

The shipper has the right to have the carrier carry his goods on the common-law liability, and before the carrier can exonerate itself from this liability it must have an alternative

rate on file with the commission and at its station where the goods are tendered for shipment.

9. CARRIERS. *Carriage of goods. Action. Liability as warehouse-man.*

   Under the facts in this case, which was an action against a railroad for the destruction by fire of cotton shipped, even had the railroad proved its liability was that of a ware-houseman and not of a common carrier, it could not have escaped liability on the ground that no liability as a ware-houseman was set forth in the pleadings, since the suit was brought under the common-law liability in the declaration, and the railroad, under its notice under the general issue which constituted part of the pleadings, alleged that the cotton was destroyed by fire not caused by its negligence, and the plaintiff in reply insisted under the notice, that it was caused by the negligence of the railroad company, and the proof tended clearly to establish such negligence.

APPEAL from the circuit court of Chickasaw county. HON. J. L. BATES, Judge.

Suit by the Hill Manufacturing Company against the New Orleans, Mobile & Chicago Railroad Company. From a judgment for the defendant, plaintiff appeals.

The Hill Manufacturing Company, a corporation under the laws of the state of Maine, filed suit against the New Orleans, Mobile & Chicago Railroad Company in the first district of Chickasaw county, Miss., alleging that on the 27th day of January, 1912, the Newburger Cotton Company, being the owner of fifty bales of cotton weighing twenty-six thousand nine hundred and six pounds, valued at ten and three-eighth cents per pound, bearing certain marks described in the declaration, was tendered to and accepted by the New Orleans, Mobile & Chicago Railroad Company, and that said cotton was to be shipped from Houston, Miss., to Lewiston, Me., and that the freight charges of two hundred twenty-six dollars and one cent were paid to the railroad company, and that the Hill Manufacturing Company, for a valuable consideration, became the *bona-fide* owner of the bill of lading. It was further alleged

that the railroad company failed to deliver the said cotton with the exception of three bales, and that the forty-seven bales not delivered were of the value of two thousand six hundred twenty-seven dollars and fifty seven cents, and suit was brought for said amount, interest, and costs. A copy of the bill of lading was attached to the declaration, which will be referred to hereafter in the statement of facts.

The defendant pleaded the general issue, and gave notice under the general issue that it would offer evidence on the trial that the cotton was never delivered to the defendant as a common carrier; that if it was so delivered to the railroad the bill of lading contained provisions: First, that no carrier or party in possession of the property described in said bill shall be liable for any loss thereof, or for damage thereto, by causes beyond its control, or by floods, delay, or quarantine, or for loss or damage on any article of property whatever, by fire or other casuality, in or at any cotton press or during transportation to or from press, or while in transit, or while in depots, or places of reception, or in depots or places of transhipment, or at depots or at landings at point of delivery; and that the defendant would prove that the cotton was destroyed by fire while in and at a cotton compress, and that said cotton was destroyed by fire which was not caused by the negligence of the defendant nor of its employees or servants. To this notice under the general issue plaintiff replied with a counter notice that it would offer evidence in rebuttal of the above evidence if it became necessary in denial or avoidance: First. That the clause of the bill of lading for the shipment of cotton in question pleaded by the defendant as an exemption from liability by fire was not binding upon the plaintiff because it was not assented to by it or solemnly entered into by the shipper with knowledge and intent that it should be binding as a special contract, and that it is unreasonable and not supported by

fair, valuable, adequate, or any consideration. Second. That the said clause in the said bill of lading that the defendant shall not be liable for any loss thereof or damage thereto by causes beyond its control or by fire or other casualty while in transit, or while in depots or places of reception, or in depots or places of transshipment, is not binding on the plaintiff because the shipper did not enter into the same or assent thereto with knowledge or intent that it should be binding as a special contract and control the respective rights of the parties, and that it is unreasonable and not supported by fair, valuable, adequate, or any consideration. Third. That the bill of lading contains the statement that the rate paid was a reduced rate, made in consideration of special agreements therein set forth and applicable thereto, yet such was not true in fact; but the rate charged and paid was in fact the highest rate that could be charged on the property which was authorized to be collected by the Interstate Commerce Commission; that there was on file no published tariff or rate with said commission permitting or providing or showing that a reduced or release rate could be charged by the defendant on this property, or for a higher rate than was charged in this instance, and that the limitations contained therein cannot protect defendant, for the furthed reason that the rate paid was the only one offered the shipper by it, and the only rate defendant was authorized by law to make, and no option was given by defendant to plaintiff or the shipper of the pretended lower rate, nor one for a higher rate; and that defendand was liable as at common law for loss or damage to the property. Fourth. That the compress at which this cotton was held by the defendant at the time it was destroyed by fire was being used by the defendant as a storing and loading depot and platform at Houston, Miss., with the consent of the compress company. At the time of the fire in question said compress was the agent of the defendant for the purpose of receiving,

receipting for, storing, and loading for the defendant cotton shipped and to be shipped from said point by special contract entered into between the defendant and the compress company on November 20, 1911, which agreement was in full force at the time the contract was made and at the time the fire occurred, and that the defendant was in control of the said compress and kept and provided at said shipping point no other platform, depot, storage or loading place for cotton than that of its agent, the compress company, and that the cotton was destroyed by fire while thus in the possession and control of the defendant's agent at Houston and thus held for shipment, and that the compress carried insurance on the said cotton for the protection of the defendant and the compress company from loss or damage by fire. Fifth. That the loss of the cotton by fire in the hands of the defendant and its agent, the compress, was the result of improper and negligent construction by the defendant of chimneys in its section houses maintained on its right of way and occupied by its servants at or near the immediate vicinity of the compress where the cotton was kept and stored by the compress and the defendant, and in negligently failing to provide, until after the said fire, suitable and proper protectors and spark arresters on the chimneys of said section houses in which the fire was kept and maintained by the defendant and its agents, and that the fire was caused by sparks from said chimney so negligently constructed and used by defendant.

The plaintiff and defendant entered into an agreement which appears of record by which it is agreed that the legal title to the bill of lading covering the cotton referred to in the declaration was, at the time of the fire and at the time of the suit, vested in plaintiff. The weight and price of the cotton was also agreed upon, and it was further agreed that the original bill of lading covering the said cotton was issued and signed by the agent of the defendant duly authorized to issue bills of

lading. It was further agreed that the agreement between the railroad and the compress was in force both at the time of the issuance of the bill of lading and at the time of the fire. This agreement between the compress and the railroad company is made an exhibit to the agreement of counsel, and among other things contains the following stipulations:

"(4) The railroad company may issue bills of lading for cotton upon the basis of loading certificates issued and furnished to it by the compress, such cotton being hereinafter styled 'loaded cotton.'

"(5) The railroad company may issue bills of lading for cotton in the possession of the compress on the basis of certificates issued by the compress and before the receipt of the cotton by the railroad company, such cotton being hereinafter styled 'billed cotton.' Billed cotton is only to be handled in exceptional cases, and not at all unless the railroad company desires to do so."

In consideration of the covenant contained in this agreement, the compress company agreed on its part:

To receive, receipt for, unload, shelter, compress, and load on cars cotton in transit; to receive, receipt for, unload, and shelter consigned cotton and warehouse cotton; to shelter, compress, and load on cars cotton to be covered by loading certificates and known as "loaded cotton;" and to shelter, compress, and load on cars "billed cotton," and not to deliver "warehouse cotton" without the written consent of the railroad company.

Second. To properly handle, store, and protect cotton in transit, and billed cotton, until the railroad company shall furnish cars to hold it, and to properly handle, store, and protect loaded cotton until actually delivered to the railroad company.

Third. To compress all cotton from whomsoever received, intended for shipment on the railroad of the railroad company, to the indensity of twenty-two and one-

half pounds per cubic foot, and to load not less than the number of bales of compressed cotton in box cars of given dimensions set out in the agreement.

Fourth.  To place on all such cotton for domestic shipment at least six bands, and all such cotton for foreign shipment, at least eight bands, and to tag all cotton.

Fifth.  To issue and furnish to the railroad company loading certificates correctly setting forth the date called for in a form set out in the stipulation, and to cover with such certificates shown in said form not more than one mark or lot of one mark of cotton, and to issue no duplicates of such certificates without the consent in writing of the railroad company; to issue to all shippers delivering to the compress company cotton intended to be shipped on the line of the railroad company certificates correctly showing the condition of the cotton when received, and each covering one mark or lot of one mark and issue no duplicates of such certificates without the consent of the railroad company.

Sixth.  To compress, load, and unload, and reload all cotton in the order of its receipt, and to avoid the breaking of lots.

Seventh.  To pay the railroad company all freight and car services, and other charges within two days after the delivery of cotton to the compress; also to assume and to pay to the railroad company the amount of all expenses incurred in putting in order any cotton compressed by the compress, and shipped on the railroad of the railroad company that may be rejected by vessels as not being in proper shipping condition under the commercial rules and regulations of the port of shipment.

Ninth.  To pay to the railroad company the premiums, and any other expenses attending same, within ten days after the account is rendered by the railroad company, on fire insurance policies covering all warehouse cot-

ton, cotton in transit, loaded cotton, and billed cotton, contained in the warehouse, on the platforms or grounds, or under the sheds of the compress, or in cars while on side tracks used for the compress, to said insurance companies as it may select, and for such amounts as the railroad company deems advisable to fully protect it against any and all loss; and all such policies of insurance shall be made payable to the railroad company and retained in its possession.

Tenth. To protect, defend, and hold the railroad company harmless from any liability, damages, losses, or claims that may arise from the loss or injury or delay of cotton in transit, warehoused cotton, loaded cotton, or billed cotton, or any part thereof, from the time of delivery to the compress until the redelivery to the railroad company of cotton in transit and warehouse cotton, and from the time of the issue of the bills of lading by the railroad company until the delivery to the railroad company of loaded and billed cotton; and to pay all costs, lawyer's fees, and expenses that the railroad company may become liable for or suffer in any suit or proceeding to recover on account of such loss or injury or delay.

Sixteenth. To furnish to the railroad company and keep the railroad company at all times fully informed as to the name or the names of the agents or servants of the compress authorized to sign certificates, receipts loading tickets, or similar documents issued by it, together with the correct signatures of such agents or servants, and to inform the railroad company promptly when any such agent or servant shall cease to have authority to sign such documents, receipts, loading tickets, or similar documents.

Seventeenth. That all certificates, receipts, loading tickets, or similar documents issued by the compress, or by any one in its employ authorized to issue the same for cotton actually delivered to the compress, shall be

genuine, and represent cotton actually delivered and in the possession of the compress, and that each and every bale specified in such certificate, receipt, loading ticket, or similar document shall be a merchantable bale so far as weight is concerned, except as noted hereon; also to save harmless the railroad company from all liability, loss, damage, or expense which the railroad company may incur or be put to from or on account of the non-delivery to the compress, or by the compress to the railroad company, of the cotton, or any part thereof, covered by such certificates, receipts, loading tickets, or similar documents.

Eighteenth. To permit the railroad company at any and all times, by its officers and agents, to inspect the premises, records, books, and papers of the compress to the extent necessary to enable the railroad companies to verify properly certificates, receipts, loading tickets, and similar documents purporting to be issued by or on behalf of the compress, and to the extent necessary to enable the railroad company to inform itself properly as to whether the compress has fully complied with the provisions of their contract.

There are numerous other stipulations in the contract between the railroad company and the compress regulating the dealings between them. The railroad company on its part bound itself to the compress company, first, to pay ten cents per hundred pounds to the compress for compressing cotton for account of the railroad company except in cases unnecessary to mention in this statement of facts; second, to furnsh within reasonable time cars necessary for the shipment of cotton in transit and billed cotton, and, if such cars are not furnished within forty-eight hours after receipt of written notice from the compress that the cotton is compressed and ready for loading on cars, to pay to the compress the portion of the premium estimated *prorata* of the insurance paid on all cotton thereby delayed, but only for the

time of such delay; provided the compress furnished
the railroad company, by the tenth of each month, an
itemized statement; third, to make settlement with the
compress at the end of each week for all cotton com-
pressed for and delivered to the railroad company under
the agreement. The agreement was to remain in force
until the 31st day of August, 1912, following the period
during which the cotton was destroyed.

At the head of the bill of lading, under heading
"Note," is contained the following provision:

"The rate named herein is a reduced rate, given in
consideration of the shipper entering into the contract
set out below. If the shipper prefers that the
shipment shall be transported at the carrier's risk,
limited only as provided by common law and the laws of
the United States and of the several states in so far as
they apply, he can accomplish that result by notifying
the carrier's agent, and shipping at a rate twenty per
cent. higher than the rate indicated here with a mini-
mum increase of one percent. per hundred pounds."

In the bill of lading, preceding item No. 1, is the fol-
lowing stipulation:

"In consideration of all of which and especially of
said reduced rate, the shipper agrees that every service
to be performed by the company hereunder shall be sub-
ject to all the conditions herein, all of which the shipper
accepts and agrees are just and reasonable; and further
agrees that, unless the other carriers to which said
property may be delivered in the course of transporta-
tion to destination make different contract or contracts,
the transportation over said connecting carrier's lines
shall be upon the terms and conditions herein. But
neither said company nor any other carrier carrying
hereunder, as hereby provided, shall be liable for any
loss or damage not occurring on its own line, nor after
said property is ready for delivery to consignee."

Then follows item No. 1, containing the following stipulation:

"No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof, or for damage thereto, by causes beyond its control, or by floods, . . . by fire or other casualty, in or at any cotton press or during transportation to or from press, or while in transit, or while in depots or places of reception, or in depots or places of transshipment, or at depots or at landings at point of delivery."

The carrier had but one rate at its Houston office for shipment of cotton from Houston, Miss., to Lewiston, Me., and the tariffs introduced in evidence show that no tariff was on file in the office of the Interstate Commerce Commission as to cotton from Houston, Miss., to Lewiston, Me., other than the bill of lading above referred to. The carrier collected the compress charges from the shipper at the time of the issuing of the bill of lading. The cotton was destroyed by fire while in the compress at Houston, Miss., after the issuance of the bill of lading and before it was actually compressed, with the exception of three bales, which, after the fire, were loaded on cars and shipped to Lewiston, Me. The plaintiff offered proof to the effect that the fire which burned the cotton in the warehouse was caused by sparks coming from the chimney of one of the houses belonging to the defendant upon its right of way near the compress, and that the sparks were seen to fall upon the cotton and the cotton to become ignited, from which fire the compress and cotton were destroyed. The court below granted a peremptory instruction for the defendant, and judgment final was entered, from which the plaintiff appeals here.

*Joe H. Ford* and *Lewis, Adler & Laws,* for appellant.
*J. N. Flowers,* for appellee.

ETHRIDGE, J., delivered the opinion of the court.

(After stating the facts as above). Two questions
are presented for decision by this record. First: Was
the cotton delivered to the railroad company as a com-
mon carrier? Second: If it was delivered, was the
stipulation in the bill of lading that the railroad com-
pany would not be liable for the cotton in case of its
loss by fire binding on the shipper? The issuance of the
bill of lading carries the presumption that it was deliv-
ered to the common carrier. The test by which to de-
termine whether or not it was delivered to the carrier
for shipment is whether there was anything to be done
by the shipper before the cotton was to be shipped by
the railroad. If the shipper must perform some service
or do some act necessary, precedent to shipment, it
would not be a delivery to the railroad as a common
carrier. But if the shipper was to perform no further
act, or if there was no further act or thing to be done
by him, then it is a delivery to the railroad as a com-
mon carrier, although the railroad itself may have to
have some act done or performed before the cotton is
actually ready for shipment.

The liability of the carrier as a common carrier be-
gins when a shipper has done all that is required of him
and paid the proper charges. The rule is stated in sec-
tion 113 of Hutchinson on Carriers, vol. 2, as follows:

"But if the delivery be made at the warehouse or
other place of business of the carrier for as early trans-
portation as can be made in the course of the carrier's
business, and subject only to such delays as may neces-
sarily occur in awaiting the departure of trains, vessels,
or other vehicles or transportation, or from the perform-
ance of prior engagements by him, he becomes, the mo-
ment the delivery is made, a carrier as to the goods,
and his responsibility as such at once attaches. And
although there be considerable delay and long storage of

the goods until the carrier can secure cars in which to make shipment, if he receives them solely for transportation, he at once assumes the liability of a common carrier; and it makes no difference, it has been said, whether the loading is to be performed by the shipper himself or by the carrier. And the general and well-settled rule is that the liability of the common carrier commences whenever and as soon as the goods have been delivered to and accepted by him solely for transportation, although they may not be put immediately *in itinere,* but are, at first, for his own convenience and preparatory to the voyage or journey for which they are intended, temporarily deposited in his wharf or store-room. In such cases, the deposit is a mere accessory to the carriage, and does not postpone his liability as common carrier to the time when they shall be actually put in motion towards their place of destination. And a delivery to the carrier with the name and address of the consignee marked upon the goods is, in the absence of some directions or agreement otherwise, equivalent to an express direction to transport them to such consignee at once, and the reception of the goods under such circumstances imposes upon him, immediately, the obligation to forward forthwith, and the responsibility of a common carrier, unless the habitual course of dealing between the parties has been otherwise.''

We think that, measured by these rules, there was a delivery to the railroad company of the cotton in its capacity as a common carrier. It collected the charges for compressing, and under its contract with the compress company this cotton must be compressed and prepared in a certain way. It could have shipped the cotton at once, but it elected to not ship the cotton at once but permitted it to stand in the warehouse awaiting its own convenience in shipping it, as it contracted to do in the bill of lading. There is nothing in this record from which we can infer any purpose on the

117 Miss.—36.

part of the shipper to have the shipment delayed. It is contended here that the railroad company could not identify the cotton on the marks shown in the bill of lading because such marks were not actually upon the bales of cotton at the date of the issuance of the bill of lading, as shown by the testimony of the compress employees and the railroad agent. However, the railroad company had the right to inspect the compress and any of its books, and it clearly appears that there is no trouble in taking the clearance receipt issued by the compress to the shipper upon which the railroad issued the bill of lading, and identifying the cotton. The railroad itself had made the necessary arrangements and contracts to have the cotton shipped over its line in the manner in which this cotton was handled. The railroad company wholly failed to meet the burden imposed upon it to show that the cotton was not in condition for shipment, and that some further act must be done by the shipper. This state has decided these questions adversely to the railroad company in several cases. *Illinois Central R. R. Co.* v. *Lancashire,* 79 Miss. 114, 30 So. 43; *Southern Express Co.* v. *Craft,* 49 Miss. 480, 19 Am. Rep. 4; *St. Louis & S. F. R. Co.* v. *Woodruff Mills,* 105 Miss. 214, 62 So. 171; *Hazard & Chapin* v. *Illinois Central R. R. Co.,* 67 Miss. 32, 7 So. 280. We fail to find where the federal courts have rendered any decision contrary to the views expressed in these authorities of our state, and we think the same rule prevails in the federal court

Coming to the second question, we think that the company is liable as an insurer under the common-law rules governing carriers. It is clear from the agent's testimony and from the bills of lading introduced in evidence that there was no alternative rate at the Houston, Miss., office, and if the shipper had demanded a rate other than the one here in evidence the carrier would wholly have been unable to furnish a bill of lading. The agent undertakes to say that if the

shipper had requested a higher rate he would have taken up the question with his superior officer and have ascertained whether he could have furnished such rate. We think that it is the duty of the railroad company to have the bill of lading at its office where the shipper applied in order to bind the shipper in a contract for a limited liability. The shipper does not have to wait until the agent can communicate with a foreign office or go to other places to find a bill of lading. However, it appears to our satisfaction that there was no such rate at any office of the railroad company because the railroad company had never filed any such rate with the Interstate Commerce Commission as required by law. We concede that if the rate and tariff had been on file with the Interstate Commerce Commission, and also on file in the office at Houston, the railroad could limit in a reasonable manner its common-law liability, and that the shipper would be bound by such stipulation, even though it did not see or read such tariff. The carrier, however, at this time, could not free itself from all liability for losses by fire for two reasons; first, it could not contract against its negligence because that would be contrary to public policy; and, second, the Carmack Amendment to the Hepburn Act of 1906 makes the carrier liable for some value, as we understand the decisions of the United States supreme court. See *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; *M. K. & T. R. R. Co.* v. *Harriman Sons,* 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. 690; *Pierce Co.* v. *Wells Fargo & Co.,* 236 U. S. 278, 35 Sup. Ct. 351, 59 L. Ed. 576; *Coal Co.* v. *Railroad Co.,* 239 U. S. 446, 36 Sup. Ct. 137, 60 L. Ed. 375; *Boston & Maine R. R.* v. *Hooker,* 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868. In this last case, at page 111 of 233 U. S., at page 528 of 34 Sup. Ct., at page 875 of 58 L. Ed., the court says:

"When there are two published rates, based upon difference in value, the legal rate automatically attaches

itself to the declared or agreed value.   Neither the
intentional nor accidental misstatement of the applicable
published rate will bind the carrier or shipper.   The
lawful rate is that which the carrier must exact and
that which the shipper must pay.''

And further says, quoting from Chicago, *R. I. & P.
R. Co.* v. *Cramer,* 232 U. S. 490, 34 Sup. Ct. 383, 58
L. Ed. 697:

''That rule of liability (the uniform rule established
by the Hepburn Act) is to be enforced in the light
of the fact that the provisions of the tariff enter into
and form a part of the contract of shipment, and if
a regularly filed tariff offers two rates, based on value,
and the goods are forwarded at the low value in order
to secure the low rate, then the carrier may avail
itself of that valuation when sued for loss or damage
to the property.''

The court also in the same case quoted from *Great
Northern R. R. Co.* v. *O'Conner,* 232 U. S. 508, 34 Sup.
Ct. 380, 58 L. Ed. 703:

''But so long as the tariff rate, based on value, re-
mained operative, it was binding upon the shipper and
carrier alike, and was to be enforced by the courts in
fixing the rights and liabilities of the parties.   The
tariffs are filed with the commission and are open to
inspection at every station.''

Of course the railroad must have the rate approved
by the commission and must have it on file available
to the shipper, and in this case it does not appear that
the carrier had the higher rate on file with the com-
mission, nor does it appear anywhere in the record
what the terms and conditions of such bill of lading were
or what particular bill of lading and what particular
stipulations could have been procured by the shipper
if he had even applied to the superior officers of the
company for such rate.   The shipper has the right to
have the carrier carry his goods on the common-law
liability, and before the carrier can exonerate itself

from this liability it must have an alternative rate on file with the commission and at its station where the goods are tendered for shipment.

In addition to what we have said, the peremptory instruction would have been error even had the carrier succeeded in showing its liability was that of warehouseman and not that of common carrier. The plaintiff tendered proof to show that the cotton was burned through the negligence of the carrier, and it could not escape liability as a warehouseman on the contention made here that no such liability was set forth in the pleadings. The notices under the general issue and the counter notices under our statutes are simplified forms of pleadings. As shown in the statement of facts, the suit was sought on the common-law liability in the declaration, and the railroad company, under its notice under the general issue, which constitutes part of the pleading, alleged the cotton was destroyed by fire not caused by its negligence. The plaintiff in reply to this defense insisted, under the notice, that it was caused by the negligence of the railroad company, and the proof tendered tended clearly to establish such negligence.

The parties having agreed on the value and weight of the cotton in question, the judgment of the court below will be reversed, and judgment entered here for the value of the cotton, with six per cent. interest from date of suit and cost in favor of appellant.

*Reversed, and judgment here.*