**ILLINOIS CENTRAL RAILROAD,**
Appellant,

v.

**E. E. MOORE, d/b/a E. E. Moore and
Company, Appellee.**
No. 12471.

United States Court of Appeals
Sixth Circuit.

Jan. 25, 1956.

Jack Petree, Memphis, Tenn. (Joseph H. Wright, John W. Freels, Chicago, Ill., Burch, Porter & Johnson, Memphis, Tenn., Evans, Petree & Cobb, Memphis, Tenn., on the brief), for appellant.

Armistead F. Clay, Memphis, Tenn. (Fitzhugh & Clay, Memphis, Tenn., on the brief), for appellee.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This appeal arises out of an action for damages instituted against a common carrier for the value of 49 bales of cotton placed by plaintiff [1] Moore, a producer and shipper of cotton, upon defendant's platform for receiving, loading and shipping cotton in bales, and destroyed by fire. Plaintiff was assignee of claims of a generally identical nature belonging to M. P. Moore and W. P. Callis.

A jury was waived and the court made detailed findings of fact which are amply sustained by the record. They are as follows:

On November 6, 1952, E. E. Moore, doing business as E. E. Moore & Company, was a buyer, producer and shipper of cotton, with an office in Senatobia, Mississippi. The defendant is and was on said date a common carrier, maintaining a station at Senatobia under the charge of W. T. Robinson, agent, and J. M. Brickell, clerk, and maintaining on its right-of-way, near its station tracks, a platform used for receiving, loading and shipping cotton in bales.

On said date, and for a long time prior thereto, the said Moore had the following custom relative to the

---

1. The parties will be designated as in the court below.

shipment of his cotton: he would ship all of it to himself, care of Federal Compress in Memphis, Tennessee, using "shipper's order notify" bill of lading, freight collect; in doing so, he would place the bales upon defendant's platform with shipping tags showing the name of the shipper and the name and address of the consignee attached thereto. The cotton when so placed and tagged was ready for immediate shipment and both Moore and the defendant's agents, Robinson and Brickell, knew this.

Brickell supervised loading the cotton into boxcars; after 100 bales had been loaded he would call Moore's bookkeeper on the telephone, give him the shipping-tag numbers and the bookkeeper would then prepare the bill of lading as a matter of convenience to both parties though such was the duty and responsibility of the defendant; defendant would not delay any shipment until the bill of lading had been prepared, as sometimes one or more cars would be in transit before the bill of lading was prepared and signed; also defendant did not wait for any particular number of bales to be placed on the platform before loading and shipping any part thereof; the loading and shipping of some of Moore's cotton was a daily routine with the defendant.

The manual loading of the cotton was done by a man named Tom Hall and one or more of his helpers. For this service he was paid by the defendant according to the number of bales loaded and he was supervised by the station clerk, Brickell; Moore desired that his cotton be sampled before it left Senatobia and, as a result of a private agreement between Hall and Moore, it was customary for Hall to take these samples while the bales were on the platform; Moore paid Hall by the bale for taking these samples; Rob-inson and Brickell knew of this practice and did not object to it, as the defendant had first call on Hall's services and his taking of the samples did not delay shipment of the cotton.

It was the duty of the defendant to prepare waybills and to obtain the necessary data therefor prior to shipping the cotton; it was customary for Brickell to obtain from Moore's bookkeeper the weights of the bales for use in making up three waybills and this information was readily available to Brickell whenever he called for it. As regards the shipper, the cotton's readiness for shipment was not affected by whether Brickell had or had not called for the weights.

Moore did not make, nor was he required to make a formal delivery of the cotton for shipment or give defendant notice of delivery; neither did the defendant make a formal acceptance thereof and none was required. Robinson and Brickell knew, whenever they saw Moore's cotton on the platform, tagged, that it was ready for immediate shipment; for a long time prior to November 6, 1952, the mere placing of the cotton on the platform by Moore and tagging it was treated by defendant as a delivery to and acceptance by it for immediate shipment, whether the station was open or closed, or whether in daylight or dark, and all parties concerned were thoroughly familiar with this custom and practice.

During the cotton season only, it was customary for the defendant to hire a nightwatchman to guard and protect the cotton on its platform and in its boxcars, thereby indicating its acceptance of responsibility for the security of cotton on its platform.

A fire occurred on the early morning of November 7, 1952, which partly destroyed defendant's plat-

form and destroyed or damaged a quantity of cotton thereon or loaded in boxcars nearby; forty-nine (49) bales belonging to Moore were destroyed or damaged by the fire; all of said bales had been placed on said platform and tagged on November 6, 1952, in accordance with the custom, usage and understanding hereinbefore described; they were so placed for immediate shipment; defendant undertook immediate shipment and loaded thirty-two (32) of the bales in one of its cars prior to the fire; nothing further remained to be done with or to the cotton by Moore as a prerequisite to shipment; it had gone into the exclusive possession of defendant prior to the fire; Moore's loss was $9,009.16; the American Fidelity Fire Insurance Company is the beneficial owner of Moore's claim.

On November 6, 1952, and for a long time prior thereto, M. P. Moore, doing business as M. P. Moore Company, was a buyer, producer and shipper of cotton with an office in Senatobia, Mississippi. M. P. Moore followed the same general method of operation as did E. E. Moore, and the custom, usage and understanding existing between the defendant and E. E. Moore, as hereinbefore described, relative to the shipment of cotton, also existed between the defendant and M. P. Moore. Thirty-two (32) bales belonging to M. P. Moore were destroyed or damaged in the said fire of November 7, 1952; all of said bales had been placed on said platform, and tagged, on November 6, 1952, in accordance with said custom and practice, usage and understanding; they were so placed for immediate shipment; these bales were part of a larger number placed on the platform the same day, the other portion thereof having been loaded by defendant prior to the fire; nothing further remained to

be done with or to this cotton by M. P. Moore as a prerequisite to shipment; it had gone into the exclusive possession of defendant prior to the fire; M. P. Moore's loss was $5,989.48. The American Fidelity Fire Insurance Company is the beneficial owner of M. P. Moore's claim.

On November 6, 1952, and for a long time prior thereto, W. W. Callis was a buyer, producer and shipper of cotton, with an office at Wyatte, Mississippi, but shipping from Senatobia, Mississippi; Callis' general method of operation differed somewhat from that of the Moores; his cotton was ginned at Wyatte, and trucked to Senatobia; his shipping tags were always attached to the bales before they left Wyatte; he usually shipped to Memphis Compress and Storage Company; his shipping tags showed bale weights while the Moores' tags did not; samples were not taken on defendant's platform; the defendant drew on Callis' bank for freight charges; Callis had told defendant he never wanted any of his cotton left on the platform over night without a bill of lading on it; the defendant would prepare the bills of lading for Callis' shipments and did not call upon his bookkeeper for bale weights; Callis' truck driver would, on the first trip each day, advise Brickell how many bales he intended to deliver during the day, and on the last trip would request the bill of lading and pick it up, if ready, if the bill was not ready, the driver or Callis would pick it up the next day or whenever convenient; otherwise, the same custom, usage and understanding existing between defendant and the Moores, relative to delivery, acceptance and shipment, also existed between the defendant and Callis; forty-five (45) bales belonging to Callis were destroyed or damaged in said fire; all of said bales, tagged

had been placed on said platform on November 6, 1952, as a part of a larger number, the other bales of which defendant loaded prior to the fire; that said forty-five (45) bales were placed on the platform in accordance with said custom, usage and understanding; they were so placed for immediate shipment; nothing further remained to be done with or to this cotton by Callis; it had gone into the exclusive possession of defendant prior to the fire; Callis' loss was $2,420.22. The American Fidelity Fire Insurance Company is the beneficial owner of Callis' claim.

All of the cotton involved herein was tagged for shipment to Memphis, Tennessee.

The court concluded as a matter of law that the railroad was liable and entered judgment in accordance with the prayer of the complaint.

■■■ Defendant's principal contention is that delivery to it as carrier was not complete at the time of the fire. It urges that the cotton must have been sampled by plaintiff's agent and plaintiff must have furnished defendant with information as to the weight of the cotton so that a waybill might be prepared in order for the relationship of carrier and shipper with its resulting liability to be established. Delivery to the carrier of the property to be transported and its acceptance for that purpose are essential in order to establish the relationship of shipper and carrier and to charge the carrier with responsibility for its safe transportation and delivery. Generally speaking, delivery occurs when the possession, custody, and control of the goods involved have been surrendered to and accepted by the carrier. The delivery may be actual or constructive. The parties may agree that the property be deposited for transportation at any particular place and without express notice to the carrier. If the dealings of the parties through a long course of custom and practice are to treat such placing of goods on the carrier's premises as a delivery to and acceptance by the carrier for immediate shipment this is sufficient. 9 Am.Jur. 652; Annotation 22 A.L.R. 971–980, and cases cited.

■■■ In support of the proposition that plaintiff had not completed delivery at the time of the fire, defendant cites Adair v. Yazoo & M. V. R. Co., 142 Miss. 345, 107 So. 371, and Hill Mfg. Co. v. New Orleans, M. & C. R. R. Co., 117 Miss. 548, 78 So. 187. The Mississippi law is applicable here, as the shipment originated in Mississippi. The controlling facts of the Adair case are completely different from those of the instant case. There the owner of the cotton destroyed by fire was accumulating cotton on the station platform until he should have enough for a carload shipment. He had given the railroad no shipping directions. Here it is the finding of the court and the uncontradicted testimony that the placing of the cotton on the platform and tagging it with shipping directions were treated by defendant as a delivery to and acceptance by it for immediate shipment. The Hill case, supra, supports the judgment here. The rule there laid down by the Supreme Court of Mississippi is that if the shipper must perform some service or do some act necessary or precedent to shipment delivery to the railroad as a common carrier is not complete. Here no act precedent to shipment remained to be done by the shipper. The contention that the railroad had not issued a waybill is answered as follows by the Hill case: if the shipper was to perform no further act, or if there was no further act or thing to be done by him, then it is a delivery to the railroad as a common carrier, although the railroad itself may have to have some act done or performed before the cotton is actually ready for shipment. Defendant also relies upon S. Behrmann v. Atlantic Coast Line Railroad Co., 118 S.C. 48, 109 S.E. 397, which is the principal case in a discussion on this question in 22 A.L.R. 957. But the Behrmann case also is distin-

guished on the facts. There the cotton which was lost or stolen was placed upon the railroad platform without notice to the carrier, which did not know "the shipper, the assignee [consignee], the route, nor destination." Behrmann case, supra, 118 S.C. 48, 109 S.E. 404, 22 A.L. R. 967. Here it is agreed that the cotton was fully tagged and that defendant's agents had been notified that the cotton was ready for immediate shipment. So far as the shipper was concerned nothing was left to be done. Defendant's claim that plaintiff had instructed defendant's station agent not to load or ship any of the cotton until it had been sampled is unsupported by the record.

The District Court found that nothing remained to be done with or to the cotton as a prerequisite for shipment. While it was shown that with defendant's consent plaintiff arranged to have the cotton sampled prior to shipment, the sampling did not interfere with the shipment of the cotton. It nowhere appears that the sampling constituted a prerequisite or any part of the preparation for shipment.

As correctly found by the District Court it was defendant's duty to prepare the waybill and the information as to the weights of the bales was readily available to defendant. The making of the waybill was no part of plaintiff's preparation of the goods for transportation. Hill Mfg. Co. v. New Orleans, M. & C. R. R. Co., supra. Finally, defendant contends that it is released from liability by virtue of a paper, Form 111, which plaintiff had signed releasing defendant from responsibility for injury to cotton placed upon defendant's right-of-way. This release is inapplicable here. It states upon its face, and it is undisputed, that it was given for no consideration. Moreover, the whole tenor of the document shows that it was meant to cover commodities placed for storage rather than for immediate shipment.

The judgment of the District Court is affirmed.