TOKIO MARINE AND FIRE INSURANCE COMPANY, LTD., as Subrogee for Matsushita Electric Corporation of America, and Chiyoda Fire and Marine Insurance Company, Ltd., as Subrogee for Matsushita Electric Corporation of America, Plaintiffs,

v.

AMATO MOTORS, INC., Raven Transport, Inc., a/k/a Raven Trailer Transport, Chicago and Northwestern Transportation Company, and American President Intermodal Co., Ltd., Defendants.

No. 90 C 4823.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 15, 1994.

Dennis Minichello, James D. Reinfranck, Kech Mahin & Cate, Chicago, IL, for plaintiffs.

Mark E. Condon, Peter W. Schoonmaker, Condon, Cook & Roche, Chicago, IL, for Amato.

Donald Cahill Shine, Christopher Patrick Koback, Nisen & Elliott, Chicago, IL, for Raven.

George T. Brugess, Chicago and Northwestern Transp. Co., Chicago, IL, for Chicago NW.

Arthur Weil Friedman Miller, Shakman, Hamilton, Kurtzon & Schlifke, Chicago, IL, Gus Salvos, Oak Brook, IL, for American President.

## AMENDED MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

In early December 1989, Matsushita Electric Corporation of America, acting through its agent, Hub City, contracted with American President Intermodal Company, Ltd. (API) to transport several containers of Panasonic equipment from Seattle to Chicago. The container's ultimate destination was to be a warehouse in Arlington Heights, Illinois. API—the carrier for the first leg of the journey—was to provide "ramp-to-ramp" service, transporting the containers from a Seattle railhead to the Chicago and Northwestern (C & NW) railhead in Chicago. Another company, Amato Motors, was in charge of moving the containers from Chicago to the Panasonic Warehouse in Arlington Heights, Illinois.

The containers left Washington State on December 12, 1989. On December 15, API notified Amato by fax that the containers would arrive in Chicago the next day. The fax contained two crucial bits of confidential information Amato would need before it could take possession: the container and pick-up numbers.

After depositing the containers at the C & NW railhead in Chicago on December 16, API informed Amato—first verbally, then via fax—that the containers had been constructively placed and were available for pick-up. Amato would not be picking up the container itself, having subcontracted with another company, Raven Transport, to pick up the containers on December 18th and take them to the Arlington Heights warehouse. Amato faxed Raven, passing on the confidential container and pick-up numbers recently forwarded by API.

On December 18, a man entered the C & NW yard driving Raven tractor No. 105. He identified himself as "Wilson," a Raven employee, and presented the confidential pick-up number for one of the seven containers. After loading the newly-released container into the Raven truck, Wilson drove straight past the C & NW guards, on through the gates, and out of this story.

Certain facts emerged quickly—Raven employed no one named "Wilson"; Raven tractor No. 105 was reported missing—but not quickly enough. The container, like the imposter who pilfered it, had disappeared without a trace.

Tokio Marine and Fire Insurance Co., Ltd. and Chiyoda Fire and Marine Insurance Co., Ltd. had insured the containers. They compensated Matsushita for the lost goods stored in the container, paying $452,117.41 and $38,194.00 respectively. The insurers, as subrogees for Matsushita, now seek to hold API liable for the value of the lost merchan-

dise under 49 U.S.C. § 11707, the Carmack Amendment.[1] The insurers allege that the first carrier was contractually obligated to guarantee physical delivery of the container into the hands of the second carrier. Since the second carrier (Amato, the "notify" party) had inherited nothing it could physically pick up, API—so the insurers would have it—is strictly liable under the Carmack Amendment for their loss.

API moves for summary judgement pursuant to Fed.R.Civ.P. 56, claiming that, first, it fulfilled its contractual obligations; second, it fulfilled any legal duty owed to the shipper when it delivered the container to Chicago and notified Amato that it was ready for pick-up; and third, it cannot be held liable for a loss occurring subsequent to its relinquishing control. API argues that it is entitled to summary judgment because the insurers can allege no genuine issues of material fact regarding API's liability.

Summary judgment is appropriate if, after drawing all reasonable inferences in favor of the nonmoving party, the court concludes there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 320 (7th Cir.1992). In deciding motions for summary judgment, the district court has "one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994) (citations omitted).

The parties, in turn, bear a concomitant burden to identify specific evidence that will facilitate this assessment. *Id.* If the non-movant fails to "come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court *must* enter summary judgment against her." *Id.*, citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

## I. A Prima Facie Case Under the Carmack Amendment

The insurers bring this action against API under 49 U.S.C. § 11707, the Carmack Amendment.[2] They allege that API, as the "initial receiving carrier,"[3] is

---

1. The case is familiar. In *Tokio Marine and Fire Ins. Co., Ltd. v. Amato Motors, Inc.*, 770 F.Supp. 426 (1991), I court that API was "required by the Interstate Commerce Commission (ICC) to provide for contractual liability 'consistent with' the Carmack Amendment terms...." *Id.* at 430.

   In *Tokio Marine and Fire Ins. Co., Ltd. v. Amato Motors Inc.*, 996 F.2d 874 (7th Cir.1993), the Court of Appeals reversed, finding "no authority to support the district court's theory that the statute authorizing the ICC to create exemptions, 49 U.S.C. § 10505, and the ensuing regulation, 49 C.F.R. §·1090.2, created an implied cause of action on which a shipper may sue." *Id.* at 880. The Seventh Circuit remanded the matter to district court "with instructions to allow plaintiffs to replead their cause of action under the Carmack Amendment, 49 U.S.C. § 11707." *Id.*

2. The substance of what was once 49 U.S.C. § 20(11) has been recodified as 49 U.S.C. §§ 11707, 10730 and 10103. These sections are now commonly referred to as the "Carmack Amendment." Section 11707, relevant for present purposes, states:

   A common carrier ... subject to the jurisdiction of the Interstate Commerce Commission ... shall issue a receipt or bill of lading for property it received for transportation.... That carrier ... and any other common carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Commission ... are liable to the person entitled to under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property cause by (1) the receiving carrier (2) the delivering carrier, or (3) another carrier over whose line or route the property is transported in the United States.

3. The Carmack Amendment allows civil suit against the initial receiving carrier under 49 U.S.C. § 11707(d)(2)(A)(i), the delivering carrier under § 11707(d)(2)(A)(ii), or the carrier in control of the goods at the time of loss under § 11707(d)(2)(A)(iii)). The insurers' briefs do not specify under which section of the Carmack Amendment they wish to hold API liable, but since they allege that API acted as the initial receiving carrier and was in control of the goods when they were lost, this court assumes the insurers wish to find API liable under § 11707(2)(A)(i), § 11707(2)(A)(iii), or both.

   Both claims can, and should, be brought in this court. *Tokio Marine*, 770 F.Supp. at 430, *rev'd on other grounds*, 996 F.2d 874 (7th Cir. 1993) (finding that although a claim under § 11707(d)(2)(A)(iii) technically should be brought in the district where the shipment originated, bringing all the claims against API and the

strictly liable for the value of the goods stolen by the imposter. To establish a prima facie case under the Carmack Amendment a plaintiff must prove that (1) the goods in question had been delivered to the carrier in good condition; (2) the goods had arrived at the final destination in a damaged or diminished condition; and (3) the damages can be specified. *S.C. Johnson & Sons, Inc. v. Louisville & Nashville R.R.*, 695 F.2d 253, 256 (7th Cir.1982); *Louis Padnos Iron & Metal Co. v. Chesapeake and Ohio Ry.*, 500 F.Supp. 591, 595 (1980). *See also Jos. Schlitz Brewing Co. v. Transcon Lines*, 757 F.2d 171, 173 (7th Cir.1985), *cert. denied*, 474 U.S. 848, 106 S.Ct. 143, 88 L.Ed.2d 118 (1985). Only after the shipper has established a prima facie case may the carrier assert one of the following events as a defense: (1) an act of God, (2) an act of the public enemy, (3) an act of the shipper, (4) an act of the public authority or (5) the inherent nature or vice of the goods. *S.C. Johnson & Sons*, 695 F.2d at 256. Federal law applies.[4]

■ No one disputes that the insurers have fulfilled the first and third elements of the prima facie test. To defeat API's motion, the insurers must present evidence establishing the second element: the goods arrival at the final destination in a damaged or diminished condition. Which destination of the two-leg journey is considered "final" is significant. The insurers claim API is liable because the container disappeared before it reached the Arlington Heights warehouse (the ultimate destination). API, however, maintains that it had fulfilled its contract by delivering the containers to the railhead in Chicago (the penultimate destination for the containers, but the "final" destination for API's purposes).

Raven, the carrier hired to transport the containers to their ultimate destination on the second leg of their journey, could not deliver what it could not pick up. Is API liable for the container's disappearance after dropping it off? Was it required to physically deliver the containers into the hands of the notify party as the insurers claim? Or was API only obligated, as it maintains, to get the goods to Chicago, inform Amato of the arrival, and provide it with the confidential pickup and container numbers it would need to take possession. The answer to these questions centers around API's contractual duties.

■ Because a carrier's liability for the loss of goods shipped through interstate commerce extinguishes upon delivery, the issue turns on what constitutes delivery. Since "delivery" must mean "delivery as required by the contract ... the intention of the parties" defines the scope of delivery. *Intech, Inc. v. Consolidated Freightways*, 836 F.2d 672, 674–75 (1st Cir.1987). *See also John Morrell & Co. v. Frozen Food Exp., Inc.*, 700 F.2d 256, 258 (5th Cir.1983). Generally speaking, delivery occurs when one party surrenders—and the other party accepts—possession, custody, and control of the goods involved. *Illinois Central R.R. v. Moore*, 228 F.2d 873, 877 (6th Cir.1956).

I have scrutinized the deposition testimony of Hub City's president (James Decker), C & NW's terminal superintendent (James Gates), API's Vice President of Transportation Purchasing in 1989 (Dan Charles Pendleton), Amato's President (Paul Walk), and APL's[5] Land Transport Regional Service Manager (Katalin Toth). They all testified about the custom, the practice, and the intention of the parties regarding ramp-to-ramp service. The consensus among them is that "delivery" was understood to consist—and was intended to consist—of the following:

1. Transporting the shipment to the C & NW ramp in Chicago;

2. Placing the container on a chassis; and

3. Informing the consignee or notify party that the containers were available to be picked up.

---

other named defendants in the same venue promotes judicial efficiency). Since API has assumed for the purposes of this motion that it acted as the "initial receiving carrier," this court does likewise.

**4.** The remedy provision of the Carmack Amendment preempts all state and common law remedies inconsistent with the Interstate Commerce Act. *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407 (7th Cir.1987).

**5.** APL was formerly known as API.

To defeat API's motion for summary judgment, the insurers must present evidence that the contracting parties intended API to do something other than these three things. This they have not done. The record contains no support for the insurers' claim that API was required physically to deliver the containers into the hands of the succeeding carrier. Nevertheless, the insurers incessantly reiterate "Physical delivery was required! Physical delivery was required!", as if repeating it often enough eventually would make it so. Chanting a mantra is no substitute for arguing the evidence.

Since the insurers fail to present evidence which would convince a jury they could satisfy a prima facie case under the Carmack Amendment, this court grants API's motion for summary judgment.

## II. Local Rule 12(n)

■ An adequate alternative ground for granting summary judgment exists, albeit a technical rather than a substantive one. In response to API's motion, the insurers purport to helpfully "summarize" the deposition testimony of Mssrs. Pendleton, Gates, Powell, and Decker in a section not inconspicuously labeled "Facts." The insurers inform this court that these "Facts" are summarized from the "facts found in the 12(n) statement of the plaintiffs, [and are] supported by deposition testimony...." None of the "summaries" cite to the record, but then there is good reason why the insurers might avoid citing to support in the record in support. Such support does not exist.

A single example, from many possible ones, suffices to give a flavor of these "summarizing" techniques. On the second page of

their responsive brief, the insurers make the following assertion:

> API understood the agreement to require the C & NW to, ground containers from railcars to chassis, store the container until pick up by the notify parties, notify the proper party for pick up and *do what was necessary to physically deliver containers into the hands of the notify parties* (emphasis added).

■ No citation exists to point the court to the specific place in the record supporting this "summarized" statement of fact. The judge, therefore, is forced to play detective and ferret out the relevant portions of testimony.[6] After combing through the depositions, it transpires that Mr. Pendleton, at the time an API employee, and Mr. Gates, a C & NW employee, both testified that the only duty of API and C & NW was to make the containers available to Amato for pick up, and notify Amato to this effect. Yet the insurers claim this testimony supports the proposition that physical delivery "into the hands of the notify party" was required.[7] Such "summarization" brings to mind Desdemona's·incredulous response to Othello's life story: "'[T]was strange, 'twas passing strange;/'Twas pitiful, 'twas wondrous pitiful."[8]

Two things are worth noting about the insurers' methods. The first concerns the absence of citations in their 12(N) factual "summaries." In the Northern District of Illinois, Local General Rule 12(N) requires that:

> Each party opposing a motion pursuant to F.R.Civ.P. 56 shall serve and file—
>
> (1) any opposing affidavits and other materials referred to in F.R.Civ.P. 56(e);

---

**6.** Courts, needless to say, are not obliged "to scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment." *L.S. Heath & Son v. AT & T Information Systems, Inc.,* 9 F.3d 561, 567 (7th Cir.1993). But sometimes our curiosity gets the better of us.

**7.** In his deposition, Mr. Pendleton does initially appear to assent to the idea that one of the services that C & NW would provide was "the actual physical delivery of the container into the notified party's hands." However, he then goes

on to clarify his testimony to avoid confusion, telling his questioner:

> Your terminology is not correct in using the term delivery into the hands. What is specified in the contract and in the obligation of C[ & ]NW is to make the container available for pick up....

Although the insurers would blur the distinction between pick up and delivery, anyone who has ordered late night pizza understands the difference between the two.

**8.** William Shakespeare, *Othello* act 1, sc. 3.

(2) a supporting memorandum of law; and

(3) a concise response to the movant's statement that shall contain:

(a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and

(b) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon....

Moreover, all material facts set forth by the moving party "will be deemed to be admitted unless controverted by the statement of the moving party." *Id.*

By failing to make the required references to transcripts or exhibits in their "Facts" section, the insurers have failed to satisfy Local Rule 12(N)(e)(b).[9] The factual statements required by such local rules are "not merely superfluous abstracts of the evidence" but are

> intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own.

*Waldridge,* 24 F.3d at 923 (citation omitted).

■ Failure to comply with the local rules is "not a harmless technicality," but a mistake the Seventh Circuit has conclusively "deemed fatal." *Id.* at 924. The district

courts have discretion whether to apply the rule strictly. *Id.* at 923–24. The Court of Appeals has continually upheld this discretion by "sustaining the entry of summary judgement when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts." *Id.* at 922 (citations omitted).

In choosing to exercise my discretion strictly to construe the local rules, I find that the insurers' failure to comply with the citation requirements of 12(N) provides adequate and independent grounds for granting summary judgment.

### III. Rule 11

The second thing worth noting about the insurers' summarizing methods—far more serious than simply not citing to the record—is the nature of the summaries themselves. They are misleading if they are not fraudulent. The insurers have offered this court summarized deposition testimony regarding what they saw as API's duty to physically delivery the containers. This testimony not only resists such characterization, it actually supports the opposite contention: physical delivery was neither required, expected, nor intended.

■ Rule 11 requires that all pleadings and motions of a party represented by an attorney be signed by that attorney, certifying

> that to the best of the signer's knowledge, information" and belief formed after reasonable inquiry it is *well grounded in fact* ... warranted by existing law ... [and] not interposed for any improper purpose....

**9.** Another part of the rule also requires "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon...." Local Rule 12(N)(3)(a).

But I am not referring to this portion of the rule, which the insurers appear to have satisfied (in their brief entitled "Statement of Material Facts Pursuant to Local Rule 12(N) ... In Response to the Motion for Summary Judg-

ment....."). The present discussion centers around Rule 12(N)(3)(b)'s statement of "additional facts."

Since the insurers themselves have identified the "Facts" section at the beginning of their "Response .. to the Motion for Summary Judgment" with those facts in their separately filed "Statement of Material Facts Pursuant to Local Rule 12(N)" (which it purports to distill), this court treats all responsive numbered statements explicitly labeled "Facts" as coming within the scope of Local Rule 12(N)(3)(b).

*Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988) (emphasis added). It also provides that appropriate sanctions *"shall* be imposed if its provisions are violated." *Id.* The district courts are "best acquainted with the local bar's litigation practices and thus best situated to determine when a sanction is warranted to serve Rule 11's goal of specific and general deterrence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 404, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990). The Court of Appeals defers to their judgment in such matters, reversing only if there has been an abuse of discretion (i.e., the finding was clearly erroneous).[10] *Id.*

This court is neither insensitive to the attorney's duty to advocate zealously on behalf of a client, nor unaware that within the adversary system facts may reasonably be slanted within the limits of propriety through the manipulation of language. But the admittedly fine line between zealous advocacy and misrepresentation, between slanting and distorting, appears decisively to have been crossed here.

█ This court has the discretion to impose Rule 11 sanctions sua sponte. *Burda v. M. Ecker Co.* 2 F.3d 769, 755 (7th Cir.1994). But since the soundest decision is usually the most thoroughly informed one, I seek views from both sides on the matter. Therefore I request the insurers' attorneys to show cause why they should not be sanctioned, and, alternatively, what sanctions, if any, ought to be imposed. And I invite API—as the most direct victim (after the court) of attorney mischief—to brief me on the appropriateness and scope of Rule 11 sanctions against their opposing counsel.

Summary Judgment granted.

---

**10.** As the Supreme Court has stated,

> Deference to the determination of courts on the front lines of litigation will enhance these courts' ability to control the litigants before them. Such deference will streamline the litigation process by freeing appellate courts from the duty of reweighing evidence and reconsidering facts already weighed and considered by the district court; it will also discourage litigants from pursuing marginal appeals, thus reducing the amount of satellite litigation.

> *Cooter & Gell,* 496 U.S. at 404, 110 S.Ct. at 2460.