**LOUIS PADNOS IRON & METAL CO., Plaintiff,**

v.

**CHESAPEAKE AND OHIO RAILWAY CO., Defendant.**

**Nos. 74 C 2453, 75 C 4143.**

United States District Court, N. D. Illinois, E. D.

Oct. 20, 1980.

---

Abraham A. Diamond, Chicago, Ill., for plaintiff.

James R. Gannon, Robert A. Subkowsky, Lewis, Overbeck & Furman, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This is an action[1] brought by plaintiff Louis Padnos Iron & Metal Co. ("Padnos"), a scrap iron and steel processor and shipper, for alleged losses of scrap after it had been delivered to defendant Chesapeake and Ohio Railway Co. ("C&O") for transmittal to various consignees of Padnos. This opinion will deal with both Padnos' and C&O's requests for pre-trial rulings of law.[2]

### Facts

Padnos' plant at Holland, Michigan is served by the tracks of C&O. Padnos obtains open-top gondola cars from C&O, weighs them empty (the "tare" weight), loads them with scrap, weighs the loaded cars and prepares bills of lading consigning the cars to steel mills and other consumers of scrap ("consignees").

C&O issues the bills of lading, which are both the contract between the parties and a receipt for the cars C&O receives from Padnos. Each bill of lading sets forth the gross weight, actual tare and actual net weight of each car identified as being shipped. C&O then invoices Padnos for the applicable freight charges based on the weights appearing on the bills of lading. Multiple cars are frequently shipped under a single bill of lading in order to satisfy tariff requirements for the use of special freight rates lower than those that apply to single car shipments.

C&O transports the loaded cars either directly or through connecting lines to the consignees. With respect to the thirty-four consignees involved in this action, C&O is the delivering carrier in only three instances; in all other cases C&O delivers the cars to connecting railroads. However, C&O is the "origin" or receiving carrier of all cars of scrap involved here.

C&O or the delivering carrier makes delivery to a single location for each consignee, often outside the consignee's property. Cars are then moved by the consignee's own engines and not handled again by any railroad until they are returned empty to the delivery track, where the delivering carrier removes them.[3]

Each consignee weighs each car it receives on railroad track scales, after which the scrap is unloaded onto stock piles and the car is weighed empty. Consignees pay for scrap received based on net weights determined on their own scales in the above manner, under the contractual term "consumers weights and grading to govern." Padnos sells its scrap through brokers or intermediaries based on settlements they receive from the consignees. Significantly, when there is a shortage (consignee *net* weights are less than Padnos' *net* weights), Padnos is paid based on the consignee destination net weights.[4]

These actions are predicated on Padnos' claim that C&O is legally responsible for alleged shortages respecting the delivery of 595 cars between March 6, 1972 and Febru-

---

1. Both 74 C 2453 and 75 C 4143 involve substantially similar legal issues and fact patterns and were consolidated by an Order dated May 26, 1976.

2. Padnos' motion for summary judgment as to liability, fully briefed on October 31, 1977, was also undecided when this action was reassigned to this Court. However, in a pre-trial conference before Judge Roszkowski on August 1, 1979, the parties agreed to submit requests for pre trial rulings of law, believing such rulings would "simplify the issues before the court" and possibly eliminate the need for disposition of the summary judgment motion. Accordingly, this opinion deals only with the requests for pretrial rulings.

3. While in the consignee's possession, the empty cars are frequently used for internal movement of material by the consignee, or even to carry outbound loads of the consignee's products.

4. In all determinations of *freight charges* due from Padnos, C&O applies a tolerance of one percent for loose scrap and one and one-half percent for bundled scrap. Thus if a car arrives at destination within the range, plus or minus, of those percentages, Padnos is neither charged for excess weight nor granted a refund for excess freight charges. Those tolerance factors are used because of discrepancies between scales at origin and destination. Padnos objects to the use of tolerances and instead seeks its "full actual loss."

ary 17, 1976. Padnos first filed claims for each alleged shortage at the C&O office in Richmond, Virginia. All such claims were declined, with various explanations set forth by C&O to account for shortages at destination. In numerous cases, however, C&O offered to settle claims on the basis of gross to gross weights. Padnos uniformly rejected any such settlement.

### Contentions of the Parties

Padnos claims that unexplained shortages have occurred with respect to the 595 cars of scrap. Under 49 U.S.C. § 11707(a)(1) (the Carmack Amendment, formerly 49 U.S.C. § 20(11), herein "Section 20(11)"), Padnos argues that C&O must compensate Padnos for those losses. C&O contests the claim that shortages have occurred at all,[5] but in the event the Court finds to the contrary, it also contests its liability for such losses, since they occurred while the cars were in the possession of the consignee.[6]

### Discussion

We turn to a discussion of the legal issues on which the parties have requested rulings. This discussion takes place against a background of two related factors that complicate the analysis and the resolution of the parties' contentions:

1. If the problem were presented in a laboratory environment, no dispute could exist. Under the law of the conservation of matter, the use of *net* weights would produce the same results as the use of *gross* weights. It is the addition or subtraction of matter extraneous to the delivery to each consignee that creates the disparity in results under the two weighing methods.
2. All the extraneous factors are determined only after the railroad cars are out of the possession of both Padnos

and C&O, though Padnos is of course one step farther removed from that determination than C&O. In a practical sense the resolution of the issues between the parties may be thought of as an arbitrary one—that is, it is determined by an allocation of the burden of proof, made while recognizing that in real world terms the party on whom the burden is placed may not be able to discharge it.

In addition, this case is substantially impacted by the decision *In re Net Weights for Determining Losses–Scrap Iron and Steel*, Ex parte No. 263 (Sub–No. 2), 352 I.C.C. 402 (1976) (the "ICC Decision"), aff'd *sub nom. Association of American Railroads v. ICC*, 600 F.2d 989 (D.C.Cir.1979) ("*AAR v. ICC*"). Padnos initiated the general rulemaking proceeding that culminated in the ICC Decision, and AAR (of which C&O is a member) was the active opponent of Padnos' position there. Under those circumstances, principles of collateral estoppel apply here (even though the ultimate issue in the ICC Decision was the rule to be applied in *settlement* of claims, while the ultimate issue here is the proper rule of law in *litigation* of claims). See *Proctor & Gamble Co. v. Byers Transportation Co., Inc.*, 355 F.Supp. 547, 556–57 (W.D.Mo. 1973), employing a comparable analysis to apply res judicata.

Accordingly, this opinion will deal with the effect of the ICC Decision at relevant points in the discussion.

### 1. *Applicability of Section 20(11)*

Padnos' claim rests largely on Section 20(11) and the case law under it. Section 20(11) states in relevant part:

> Any . . . railroad . . . subject to the provisions of this chapter . . . receiving property for transportation . . . shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for

---

**5.** C&O suggests that the alleged "shortages" are explained by the failure of consignee to unload the cars fully in at least 400 of the 595 cases at issue. In the remaining instances, C&O claims it offered to compensate Padnos

on the basis of the difference between gross weights at origin and destination.

**6.** Padnos rejects this conclusion. See discussion at pages 595–596.

any loss . . . to such property caused by it . . . and any such . . . railroad . . . shall be liable to the lawful holder of such receipt or bill of lading . . . for the full actual loss . . . caused by it or by any such . . . railroad . . . to which such property may be delivered. . . . [7]

■ In actions by a shipper against its carrier, the shipper establishes a prima facie case under Section 20(11) by demonstrating the delivery of the materials to be shipped in good condition, their arrival in damaged (or diminished) condition, and the amount of damage incurred as a result. *Missouri Pacific R.R. Co. v. Elmore and Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964). Padnos asserts it has established all those elements—that the bill of lading shows the net weight at delivery, the consignee's weighing demonstrates the net loss, and damages from the loss have been ascertained.

However, C&O argues that Section 20(11) is not applicable here because any alleged losses occurred while the cars were in the possession of the consignees, and because once the cargo is out of the carrier's possession it is no longer responsible for the cargo within the meaning of Section 20(11). *Chicago & North Western R.R. Co. v. Union Packing Co.*, 514 F.2d 30 (8th Cir. 1975). Essentially, C&O's position rests on the proposition that the alleged losses *must* have occurred while the cars were in the possession of the consignees, under the following explanation: In 400 of the 595 alleged losses [8] the gross weight at destination was equal to or exceeded the gross weight at delivery. Accordingly, any loss reflected by a comparison of net weights must have occurred between the time of taking the gross weight at destination and the time of taking the net weight at destination. During that period, the cars were in the exclusive possession of the consignees. Specifically, the fact that the increase in tare weight at destination over that at delivery often corresponded (roughly) to the amount of net weight loss suggests that the carriers failed to unload the cars completely. Because Section 20(11) applies only to the carrier with respect to the losses "caused by it," that section is thus not applicable here.

■ That argument is foreclosed by principles of collateral estoppel. In the ICC Decision the ICC stated, 352 I.C.C. at 410:

All of the parties [including AAR, litigating on behalf of its members, including C&O] have acknowledged the inaccuracies caused in origin and destination gross weight by the presence of precipitation, rubbish, etc.

That language referred to the following portion of the ICC Decision, 352 I.C.C. at 404–5:

Precipitation collected in the cars after tare weighing and before gross weighing will also increase the origin net weight. Precipitation collected in the cars after gross weighing at point of origin and before gross weighing at destination will clearly affect the validity of the destination gross weight . . .

After a gross weight is determined at the scrap shipment's destination, unloading is performed by means of magnets attached to cranes. By definition the magnets will only remove ferrous material from the cars leaving all refuse. It is also possible that in some instances some of the ferrous material will remain in the cars. Thus the tare weight taken after unloading will include the weight of all refuse and precipitation and may include some unloaded scrap.

Those determinations were confirmed in *AAR v. ICC*, 600 F.2d at 992, 998:

The undisputed evidence before the Commission established that as scrap iron and steel are generally shipped in open—topped cars ("gondolas" in railroad par-

---

7. C&O concedes that if Section 20(11) applies to it at all in this case, it applies to deliveries by connector railroads as well as direct deliveries to consignees by C&O (see Defendant's Reply 4). Accordingly, the discussion in this opinion relates to all disputed deliveries of scrap to consignees, unless indicated otherwise.

8. See footnote 5 as to C&O's position on the remaining 195 deliveries.

lance), the comparison of gross weights at origin and destination inevitably tends to be an imprecise measure of the "full actual loss" due to such sources of inaccuracy as precipitation and other forms of foreign matter potentially affecting the car's weight. . . .

During the hearing before the Commission, all the evidence indicates that due to precipitation, rubbish, etc. gross weights were inaccurate measures of losses in transit. . . .

C&O may not relitigate that issue, given the finding adverse to its position in a proceeding in which C&O's privy was a litigant.

■ Moreover, even if collateral estoppel were held inapplicable, this Court (as did the ICC and the Court of Appeals for the District of Columbia on appeal from the ICC Decision) finds C&O's reasoning unpersuasive. There is no room for a holding that no losses *could* have been caused by C&O, and Section 20(11) is therefore plainly applicable in this case.[9]

### 2. Burden of Proof of "Cause" Under Section 20(11)

C&O's second requested pre–trial ruling of law is: "If Section 20(11) does apply any loss suffered by Plaintiff was not caused by the C&O or any carrier for which the C&O is responsible." That determination of course is really one of fact rather than law. However, both parties have briefed extensively on the question of who carries the burden of proving the cause of loss under Section 20(11). Because that burden is likely to be outcome–determinative in this case, this Court will treat the second C&O request as encompassing that legal question.

**9.** In ruling that Section 20(11) applies, this Court case does not deprive C&O of any defenses under that provision. It still must be demonstrated that C&O caused the alleged loss in order for liability to attach.

**10.** Such prima facie establishment is discussed in the next section of this opinion.

Each of C&O and Padnos has argued persuasively for a favorable ruling on this issue. C&O notes that it had no way of ascertaining the practices of consignees upon receipt of the cars and accordingly should not be required to demonstrate affirmatively that such practices caused the alleged losses. Similarly, Padnos acquires no knowledge of the practices of either the consignee or C&O that would facilitate its proof of the cause of loss. Additionally, both parties have made plausible explanations as to the possible origin of any losses that may have occurred.

Padnos urges that *Missouri Pacific* sets forth the applicable burden of proof. In that case the Supreme Court stated (377 U.S. at 138, 143–44, 84 S.Ct. at 1147–1148) that once the shipper establishes his prima facie case of loss:[10]

> the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes[11] relieving the carrier of liability. . . . The general rule of carrier liability is based upon the sound premise that the carrier has peculiarly within its knowledge "[a]ll the facts and circumstances upon which [it] may rely to relieve [it] of [its] duty. . . . In consequence, the law casts upon [it] the burden of the loss which [it] cannot explain. . . ." (citation omitted)

As C&O has pointed out, there is some difficulty in applying the *Missouri–Pacific* burden of proof to the facts of this case. It is simply not true here that the carrier has "peculiarly within its knowledge *all* the facts and circumstances" that may account for any losses. C&O has no more knowledge than Padnos as to the circumstance that it alleges is responsible for the loss: the activities of the consignee upon receipt of the cars.[12]

**11.** "(a) act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." 377 U.S. at 137, 84 S.Ct. at 1144.

**12.** Additionally, C&O cites extensive authority for the proposition that failure of the consignee to unload the cars delivered by the carrier is a

This Court has considered C&O's argument and is aware of the difficulties C&O would incur in attempting to demonstrate the causes of loss in this instance. The Court also recognizes that this case does not fit neatly into the analysis established by *Missouri–Pacific.*

■ But once again collateral estoppel operates to foreclose C&O's argument. Both the ICC Decision and *AAR v. ICC* confirm that consignees have a duty to unload all material extraneous to the shipment as well as the goods shipped. Each also confirms that it is the duty of *C&O* and its fellow carriers to enforce the consignee's delinquency in meeting that requirement. As the ICC put it, 352 I.C.C. at 405, 412, 413–14:

> The consignees are not fully loading on cars and the carriers are not policing the unloading requirement by charging the demurrage fees or refuse rates required by *Consignees' Obligation To Unload Rail Cars,* [340 I.C.C. 405]....
>
> As consignees presently have the obligation to unload cars completely, carriers may protect themselves simply by enforcing this obligation....
>
> Upon consideration of the entire record herein, we ultimately conclude and find:
>
> \* \* \* \* \* \*
>
> (7) That the railroads have failed to enforce the requirements of *Consignees' Obligation To Unload Rail Cars,* 344 I.C.C. 405, and are hereby admonished to enforce those requirements and those of rule 27 of the Uniform Freight Classification....

See *AAR v. ICC,* 600 F.2d at 998 n. 33.

■ Even apart from collateral estoppel C&O has cited no authority, and the Court has found none, to the effect that the circumstances cited by C&O should shift the burden of proving cause of loss to the shipper, who is ignorant not only of the actions of the consignee with respect to the scrap but *also* of the actions of the carrier and its

risk borne by the shipper, and that the carrier's responsibility ends upon delivery of the cars to the consignees.

successor carriers during the lengthy transit period. In short, while not having access to "knowledge of all the facts" that may account for alleged losses, the carrier does have access to more of those "facts" than does the shipper, coupled with the ability to eliminate one significant source of unknown facts—the failure of the consignee to unload.

Accordingly, this Court finds that the burden of proving the cause of losses most equitably falls on the carrier, C&O.

3. *Determination That a Loss Has Occurred and the Extent of Such Loss: Net Versus Gross Weights*

Several of the pre–trial rulings of law requested by both parties pertain to the proper method for measuring a loss of freight. As outlined in the above discussion, C&O argues that a comparison of gross weights of the cars at delivery and destination is the appropriate means of determining (1) if any loss has occurred during transit and (2) the extent of such loss. Padnos urges that the proper measure of loss is the difference between net weights [13] at delivery and destination.

Padnos relies on the ICC Decision and its affirmance in *AAR v. ICC,* which resulted in the promulgation of 49 C.F.R. § 1005.7:

> Where weight is used as a measure of loss in rail transit of scrap iron and steel and actual tare and gross weights are determined at origin and destination, the settlement of claims shall be based upon a comparison of net weights at origin and destination..

C&O contests the applicability of the ICC Decision and the new rule to the instant case on three grounds: First, all the shipments at issue here occurred before the date the rule was promulgated. Second, as expressly noted in *AAR v. ICC,* 600 F.2d at 993:

> The net weights regulation involved here applies only to voluntary settlement of

---

**13.** Net weight is determined by subtracting the tare weight from the gross weight of each car.

loss and damage claims. It does not apply when such claims are litigated in court.

Third and relatedly, because the regulation's applicability is confined to voluntary settlements of loss, by definition it can be used to determine only the extent of loss and not whether any loss occurred.

C&O's arguments are persuasive for the most part in suggesting that the ICC Decision and the regulation promulgated thereunder are not *binding* on the Court in this case.[14] However, the Court is certainly free to consider the reasoning of the Commission, which was based on a thorough investigation of pertinent facts, in determining what rules of law are to apply. Such consideration is particularly appropriate here, because C&O cites no authority suggesting that *law* contrary to the rule applied during the relevant time period of this lawsuit, and there is no showing of any difference in the *facts* on which the rule was based.[15]

In calculating loss in this case we start of course with the text of Section 20(11)–the carrier "shall be liable to the lawful holder of . . . the bill of lading . . . for the *full actual loss*" of cargo caused by it (emphasis added). That was precisely the inquiry in the ICC Decision. As the Court of Appeals stated in affirming the ICC Decision (600 F.2d at 995):

> The net weight regulation in effect prescribes an *evidentiary* rule that net weight, whenever it is available, is to be used in all settlements in preference to gross weight figures to determine "full and actual loss . . ." The Commission has simply determined that mechanically the former is more accurate.

C&O offers no reason to question the ICC's conclusion, and the Court finds none in its own examination of the facts. As the ICC stressed, a comparison of gross weights to determine whether a loss occurred, and if so how much, can *never* account for the non–scrap accumulations in the cars that deprive the supplier of recovery for its full loss. In contrast, under an accurately functioning net weight determination in which all scrap is removed from the car, such accumulations are properly accounted for: They neither increase or decrease the result in the calculation of actual loss. And as already pointed out, the ability to enforce the consignees' obligation to unload rests with C&O. While this Court finds that the ICC Decision and its affirmance do not *mandate* a like result, the same reasoning appears most consistent with the statutory dictate that has been in full effect during all the transactions at issue here.

■ However, this Court does not adopt "net weight" as the sole standard in ascertaining cargo losses and their extent. Rather the Court recognizes that "net weight" rather than gross weight calculations *in general* comport with the requirements of Section 20(11). As the Court of Appeals for the District of Columbia noted (600 F.2d at 993) in affirming the ICC Decision, where the loss is contested the most accurate calculation of "full actual loss" may use net weight as a starting point but must allow the carrier to "offer into evidence all relevant facts." Thus while Padnos may appropriately establish its prima facie case of cargo loss on the basis of net weight, C&O will of course be allowed to prove facts in rebuttal.[16]

## 4. Determination of Loss in Multiple Car Shipments by a Single Bill of Lading

Padnos frequently shipped scrap to its consignees in multiple car shipments,

---

**14.** Principles of collateral estoppel operate, however, as to the following finding rejecting C&O's proposed standard (352 I.C.C. at 413):

> That the practice of railroads in determining loss on shipments of scrap iron and steel by a comparison of gross weights at origin and destination is unlawful when actual tare and gross weights are determined at origin and destination.

**15.** Padnos is likewise unable to cite any pre–regulation authority that directly supports its position on the net weight issue.

**16.** For example, the Court is mindful that C&O contests the accuracy of scales used at the yards of both Padnos and its various consignees (see n. 4 for its argument that a "tolerance" is appropriately applied in these transactions). Proof of such inaccuracies would clearly be relevant.

accounted for on a single bill of lading.[17] Such shipments take advantage of special lower tariff rates applicable to bills of lading exceeding certain minimum weight requirements.

Although each car's individual weight is listed on the bill of lading, C&O argues that the bill constitutes a single contract, only obligating it to deliver the *cumulative* weight of the cars stated at the bottom of the bill. C&O therefore contends that no shortage in any individual car constitutes a breach of contract, if it delivers the designated cumulative weight.

Padnos contends that the bill of lading constitutes a divisible contract, under which any individual car delivery at less than the weight designated for that car on the bill of lading constitutes a breach, whether or not the cumulative weight for all cars on the bill is delivered.

While the bills of lading provided by the parties do not expressly state the contractual obligation C&O assumes, they strongly suggest that C&O's interpretation of the contract is correct.[18] Their listing of individual cars and their weights is accompanied by no indication that each constitutes a separate and severable obligation. In contrast, the freight charges are assessed on the cumulative weight notation on the bottom of the bill. In short, the contract contemplates a "grand total" delivery and notation of the individual car weights merely provides an inventory description, which verifies the total amount of scrap initially delivered to C&O.

█ Even if this Court were to construe each car's weight as an individual contractual obligation (which it does not), it would not look favorably on damage claims for shortages in one car when the cumulative weight obligation under a bill of lading has been satisfied. To do so would permit Padnos a double–recovery: Padnos would receive full payment from the consignee for the cumulative amount delivered, and would recover from C&O for individual car shortages as well, even though such shortages were "made up" by greater weight in other cars on the same bill of lading.

### Conclusion

As stated in this opinion, this Court finds that as a matter of law:

1. 49 U.S.C. § 11707(a)(1) [formerly 49 U.S.C. § 20(11)] applies to the facts of this dispute.

2. Under Section 20(11), C&O has the burden of proving that it is not responsible for the alleged losses of scrap that are the subject of this action.

3. Padnos' *prima facie* case of a loss and its extent may be established by comparisons of the net weights of each shipment at the time of delivery and destination. However, compliance with the mandate of Section 20(11) that compensation is to be made for the "full *actual* loss" to the shipper requires that C&O be extended the opportunity to rebut the accuracy of loss calculated by net weights with any relevant facts.

4. Each bill of lading that embodies multiple car deliveries to the same consignee constitutes a single contract, under which Padnos may recover for losses only if C&O has failed to deliver the cumulative weight of scrap designated on the bill.

---

**17.** All cars listed on a single bill of lading were *dispatched from Padnos within a twenty–four hour period.*

**18.** Significantly, all cars listed on a single bill of lading are *delivered to the same consignee,* and the material in all cars is the same. This Court's construction of the contract is confined to such bills of lading.